# CHARLESTON.

## PITTSBURG HYDRO-ELECTRIC CO. *v.* LISTON.

Submitted June 15, 1911.    Decided December 5, 1911.

1. EMINENT DOMAIN—*Condemnation for Electric Companies—Public Use.*

   The legislature may authorize the taking of private property for public use, upon making provision for just compensation therefor, by electric power, heat, light and traction companies. Clause six of ch. 13, Acts 1907, amending and re-enacting sec. 2, ch. 42, Code 1899, is not an unwarranted exercise by the legislature of the power of eminent domain. (p. 84).

2. SAME—*Public Purpose—Expediency.*

   Whether it is expedient, appropriate or necessary to provide for a public service of a particular kind or character, is a legislative, not a judicial, question. (p. 87).

3. SAME—*Jurisdiction—Public Use.*

   Courts are limited in their inquiry to the question, whether the particular service provided for is a public service. (p. 87).

4. SAME—*Exercise of Right—Agencies.*

   The legislature may select the agencies through which it will exercise the right of eminent domain, including foreign corporations. (p. 90).

5. SAME—*Foreign Electric Power Companies.*

   Sec. 30, ch. 54, Code 1906, confers upon foreign electric power, light, heat and traction companies that have complied with the conditions of law entitling them to do business in this state, and that propose to serve the public, equal right of eminent domain with like domestic companies, and subjects them to the same regulations, restrictions and liabilities. (p. 90).

Error to Circuit Court, Preston County.

Action by the Pittsburg Hydro-Electric Company against Elizabeth Liston. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*J. R. Trotter,* for plaintiff in error.

*P. J. Crogan* and *A. Bliss McCrum,* for defendant in error.

WILLIAMS, PRESIDENT:

Elizabeth Liston has obtained a writ of error to an order of the circuit court of Preston county, made in a condemnation proceeding against her by the Pittsburg Hydro-Electric Company, investing said company with title to 15.45 acres of her land at the fork of Cheat River and Big Sandy Creek in Preston county, West Virginia, upon payment to her, by it, of the sum of $500.00, ascertained by commissioners appointed in the manner provided by law to be a just compensation therefor.

Condemnation proceedings were instituted by virtue of ch. 13, Acts 1907, amending and re-enacting section 2 of chapter 42, Code 1899. That portion of the act applicable to this case is as follows, viz: "Sec. 2. The public uses for which private property may be taken or damaged, are as follows:   *   *   *
"*Sixth.* For telegraph and telephone companies and electric .power, heat, light and traction companies, when for public use. That telephone and electric light, heat, traction and power companies desiring to extend their lines in this state may place poles and wires along any county road, by and with the consent of the county court through which such lines may pass; *provided,* that all such poles and wires shall be placed and erected so as not in any way to interfere with the public use of such road or with any fruit or shade trees or with any private property; and *provided, further,* that when any such company desires to erect its poles along any street of any incorporated city, town or village, the consent of the council of such city, town or village shall first be obtained.

"*Provided,* that any power company using or occupying any highway under this act, shall furnish to any person, company or corporation, along, upon or near its line or lines desiring the same, every kind of service at the minimum charge for like services charged to any other person, company or corporation for like service, and upon the same terms, if amount of power consumed and conditions and expenses to such power company be the same; should at any time the power generated by any power company be insufficient to furnish all persons, companies and corporations the amount of power desired,. such power company shall first serve municipal corporations having contract

therefor; second, persons, companies or corporations engaged in manufacture or transportation; and third, individual customers.

"Any violation of any provisions of this clause shall work a forfeiture of all rights acquired under it."

The constitutionality of this statute is assailed by counsel for Mrs. Liston, on the ground that it authorizes the taking of private property for private use, which is in violation of the spirit of the Constitution. The authorities uniformly hold that the eminent domain exists only for the public welfare, and that private property cannot be lawfully taken for private uses. The exercise of the sovereign power for such a purpose would be an usurpation of power never delegated to the state by the people, an unwarranted invasion of the rights of private property which has always been a right, sacred in the eyes of the English common law, and still held sacred by the laws of all the States of the Union. An owner of property can only be compelled to surrender it to subserve the public good, and even then only when just compensation is paid to him, or secured to be paid. No court, so far as we know, has ever held that private property can be taken for private use. And, on the contrary, none of them hold that a state cannot lawfully take private property for public use.

Lewis, in his excellent work on Eminent Domain, sec. 1, defines eminent domain to be "the right or power of a sovereign state to appropriate private property to particular use, for the purpose of promoting the general welfare." It is an inherent, inalienable, sovereign right, and lies dormant in the state until the legislature sees fit to exercise it, either directly, or by investing some corporation, or individual, with the power to exercise it. It is interesting to note the various purposes for which the legislatures of the states have successively exercised the power of eminent domain, as discovery and invention would bring about new social and economic conditions calling for its exercise in relation to some matter not theretofore thought of. In the early history of our country the needs of the public were few, and the eminent domain was exercised in respect to a very limited number of subjects. Grist-mills and highways were about the first, and for some time the only material things in which the public had a common use. But since the advent

of steam and electric power, many water mills which once flourished, served large communities, have passed into disuse. And while the old mill acts are still retained as part of the law of this state, they are seldom, if ever, invoked in condemnation proceedings. At first public roads, turnpikes, canals and navigable streams furnished the .only means for travel and commerce, but later on, when steam began to be used as a motive power, the eminent domain was applied in the promotion of railroad development, as another means of serving the public. The following· are some of the many subjects which the legislatures of many of the states have deemed of sufficient public utility to justify the taking of private property, viz: grist-mills, public roads and turnpikes, steam and street railroads, canals, pipe lines for carrying water, oil and gas, sewers and drains, public buildings including school houses, mining privileges, irrigation of arid lands, drainage of swamp lands. And the courts have uniformly held that the taking of private property for such purposes was a lawful exercise of the state's power. In more recent years the discovery of that hidden, magic force known as electricity, and all the varied uses to which it has been applied to serve the wants and· conveniences of mankind, have again called forth the exercise, by the state, of the right of eminent domain, for a purpose not theretofore contemplated. Until the discovery of this new force, and the invention of means by which it could be transmitted, controlled and applied, so as to give light, heat. and power, only a limited use could be made of the natural water-falls which abound in this state. It is not practicable to transmit water ·power a very great distance, and, in order to utilize the water-falls as a direct motive power at all, mills and factories would have to be erected nearby, and very many of such water-falls are found in sections remote from railroads. But these water-falls, however remote from railroad development, may be utilized to develop electricity, and electricity possesses the quality of being separated and transmitted by means of wire over hill and valley for a long distance, without a very. great diminution of its force. By this means water power can be converted into electric power, and transmitted over a wide area, and be made to serve the uses of a greater number of people than any other physical force yet discovered. Moreover, electricity possesses ·the combined

qualities of heat, light and power, and is, therefore, capable of supplying more of man's wants and needs than any other natural force now known. For some, or all, of these different purposes it is now in almost universal use in every civilized country on the globe. But electricity is not self-generating, some other force or power is necessary to produce it. Either steam, or water, power must be employed in the first instance before this subtle and indescribable force, known as electricity, is developed. And the legislature, realizing that the numerous natural water-falls in the state could be made to serve the public through the means of "electric power, heat, light and traction companies," invested them with the right of eminent domain. They are authorized to take the lands of private persons upon making just compensation therefor, when their purpose is to serve the public. Is there such a general demand for electricity, for heating and lighting, and as a motive power, as to warrant the legislature in extending the right of eminent domain to companies created for the purpose of supplying it? This is a legislative, not a judicial question, and the legislature has answered it affirmatively by the passage of the act in question. Its answer is conclusive on the court. The expediency, or propriety, of extending the right of eminent domain to any particular subject, provided each member of the community is given equal right and privilege with respect thereto, is a question for the legislature only, and with it the courts have nothing to do. *Railroad Co.* v. *Railroad Co.,* 17 W. Va. 812; *Varner* v. *Martin,* 21 W. Va. 534. The only question which the courts are authorized to determine is, whether or not the use intended is, in effect, a public use. This is conceded to be a judicial question. 1 Lewis on Em. Dom. (2nd. ed.) sec. 251; *Varner* v. *Martin, supra.* But it is often a perplexing question. A public use has been variously described, but never comprehensively defined, by the courts and by text writers. Judge Cooley, in his excellent work on Constitutional Limitations (7th ed.), page 766, says: "We find ourselves somewhat at sea, however, when we undertake to define, in the light of the judicial decisions, what constitutes a public use." It is not every kind of benefit that a community may derive from an enterprise which is proposed to be located in its midst, that will justify the taking of private property. A merely indirect

and collateral benefit is not sufficient. The public must have some direct and certain right, or interest in it, or control over it. Each case, however, must be determined by the application of certain general and well recognized principles.

Light, heat and power are essential to the comfort and convenience of the people of a community, and electricity is capable of supplying them. It can be distributed to each member of a community in such quantity as he may need. It may not only be applied in operating street railways, and in the running of large factories, but the farmer can, if he wants to, utilize it in lighting his house, and in operating machinery to saw wood and grind grain for his family and cattle. He could also relieve his wife of much labor by using it to operate the washing machine, the sewing machine and the churn. But it is not necessary that all the people of a community should take a portion of the electric current in order to constitute the use a public one. It is sufficient if each member of the community has an equal right to a portion of it on equal terms with every other member. That some of the residents of a city do not use gas for lighting or heating, or that some elect not to have their houses supplied with water from the public reservoir, or that some refuse to avail themselves of the general convenience afforded by the telephone, affords no reason for holding telephone, gas, water and electric power and light companies not to be public service corporations. All the residents of the city have the right to these conveniences, on the same terms with those citizens who do enjoy them, and that is sufficient to determine the service to be a public, and not a private, use.

Many states have passed statutes similar to our own, conferring the right of eminent domain upon electric companies chartered for the purpose of furnishing light, heat and power to the public, and these statutes have been generally upheld by the courts as constituting a proper exercise of the right of eminent domain. 1 Lewis on Em. Dom., sec. 268, and numerous cases cited in note 70. We have examined nearly all of those cases, and cite the following specially as supporting the constitutionality of such statutes: *Jones* v. *Electric Co.,* 125 Ga. 618, 54 S. E. 85, 6 L. R. A. 122; *Light & Power Co.* v. *Hobbs,* (N. H.) 58 Atl. 46; *McMeekin* v. *Power Co.,* 80

S. C. 512; *Manufacturing Co.* v. *Light and Water Co.,* (S. C.)
56 S. E. 664; *Stoy* v. *Hydraulic Power Co.,* 76 N. E. 1057;
*Improvement Co.* v. *Pier,* 118 N. W. 857; *Canal & Power Co.*
v. *Pratt,* 112 N. W. 395; *Matter of Niagara &c. Power Co.,*
111 App. Div. N. Y. 686; *Power Transmission Co.* v. *Spratt,*
(Mont) 88 Pac. 773; *Electric Co.* v. *Drake,* (Ore.) 78 Pac.
1031; *Walker* v. *Power Co.,* 160 Fed. Rep. 857. This last case
involved the constitutionality of an act of California.

The provision in our statute granting electric power, heat,
light and traction companies, when for public use, the right
to erect their poles and stretch their wires along public roads,
by and with the consent of the county court, and, if in a city,
town or village, by and with the consent of the authorities
thereof, does not invalidate the act. Neither is the act invali-
dated by the provision which requires such companies to furnish
service to persons along and near its line, when it occupies a
public highway, and which classifies the public to be served
into three classes, giving the preference, first, to municipal
corporations; second, persons, companies and corporations en-
gaged in manufacture or transportation; and third, individaul
customers, in the event there is not sufficient current developed
to supply all. Such classification is clearly within the legis-
lative jurisdiction, and does not constitute the use a private one.

We think the statute is constitutional, and shows wisdom on
the part of the legislature. The recent discoveries and inven-
tions by means of which electricity has been made to serve the
wants of man, have created a demand for much of the water
power of this state which heretofore could be of little use,
was of comparatively small value, and which for ages past, has
been allowed to go to waste. It requires more capital to build
electric plants, and string wires for distributing the current
to supply the needs of the people than is generally possessed by
the individuals who happen to be the owners of much of the
water power, now made valuable because of its new possible use,
and in order that it may be utilized to serve the public, the
legislature has seen fit to clothe such corporations as are charter-
ed for the purpose of supplying such current to the public, with
the right of eminent domain. A heretofore wasted natural
power can thus be made to supply a public need, and the state
still retain the right to prescribe reasonable regulations for the

protection of the public. For no public service corporation, or company can escape this inherent sovereign power which is always reserved to the state. 1 Lewis on Em. Dom., sec. 246; *Munn* v. *Illinois,* 84 U. S. 113; *Gas Co.* v. *Lowe,* 52 W. Va. 662.

That there is now no statute regulating the charges which such companies may make for services to be rendered, is immaterial. It is time to prescribe regulations when the company is ready to perform the services. Moreover, it would not be possible to determine, correctly, in advance of the erection of the company's plant, and the ascertainment of the cost of furnishing the light, power, heat, etc., what would be a fair and reasonable charge therefor to the public.

It is insisted that condemnor's petition is bad because it does not aver that it has a contract to supply any municipality, or company. This omission is immaterial. It would certainly be reversing the usual order of things to require a company to obtain a franchise, or contract, to supply the public at a certain fixed rate, before it acquired the land on which to erect its plant, and before it could know whether it would ever be in a position to comply with its agreement. After the company obtains the necessary land on which to build its plant, and the easements necessary for erecting its poles, or towers, and stringing its wire, it may then be able to know at what price it will be able to serve the public. Before this is accomplished a contract as to price would be much a matter of speculation, and one in which the public would likely be the loser. *Harlan* v. *Centralia &c. Electric Railway Co.,* 42 Wash. 634, 85 Pac. 344. The condemnor's right depends, not upon contract to supply at a certain price made in advance, but upon the law, and the provisions of its charter. It is bound by law, being a public service corporation invested with the right of eminent domain, to use the property taken, for the purposes set forth in its petition, and the order of the court; any other use, when the public needs and demands the service, would be a perversion of its privilege and a violation of its right.

There is nothing in the condemnor's petition which would indicate that it desires to make private use of the electricity which it proposes to generate. It alleges that it wants the land "for the purpose of the supply, storage and transportation

of water and water power and electric power for commercial and manufacturing purposes, and for public purposes and public uses for cities, towns, counties and other municipal corporations, and for electric street and interurban railways to be operated for public purposes and for other internal imporvement companies in Preston county and elsewhere in the State of West Virginia, and for all public purposes and public uses." And further, that it desires to proceed at once in Pleasant district in Preston county to erect and construct reservoirs and water power and electric power plants, for the storage and transportation and supply of water and water power and electric power for the aforesaid purposes. All of these purposes are certainly consistent with the public uses declared by the statute. It should not be presumed that it wants the land for a private use when it alleges that its purpose is to serve the public. It will be time enough for the state to interpose for the protection of the rights of the public when the company begins to pervert the use, if it should ever do so, to the neglect of the public which it proposes to serve. That the petition denominates one of the uses a commercial use, does not necessarily mean that the commerce is private. A sale of electric light or power to the public, whether sold to the individual members composing it, or to a municipality for their benefit, is commerce.

The order shows that evidence was produced at the hearing, but the record contains none of it, not even a copy of condemnor's charter. We must, therefore, assume that the allegations of the petition were properly proven, and that the company is duly authorized by its charter to engage in the business proposed. It was chartered under the laws of the State of Pennsylvania, but the law of this state, sec. 30, ch. 54, Code 1906, extends to it the same rights, powers and privileges that are conferred upon a domestic corporation created for the same purpose, on compliance with the provisions of law relating to foreign corporations desiring to do business in this state, and subjects it to the same regulations, restrictions and liabilities that are imposed upon like corporations created by this state. This gives it the right of eminent domain, to be exercised, however, for the public use of the citizens of West Virginia. 1 Lewis on Em. Dom., sec. 310. The legislature may confer the power of eminent domain upon a foreign public service

corporation. 1 Lewis on Em. Dom., sec. 374, and numerous cases cited under note 52.

It is insisted in brief of counsel for plaintiff in error that no general public necessity is shown to exist for exercising the eminent domain for the purpose in question. This is not a judicial question, but a legislative one. 1 Lewis on Em. Dom., secs. 255 and 596. In undertaking to pass on this question is where a few of the courts of the country have fallen into error.

Whether the necessity for taking the land in question exists in favor of the condemnor is largely a matter for its own determination. *Id.*, sec. 597.

The order of the lower court will be affirmed.

*Affirmed.*