GENE P. HANDLEY, *et al.*

*v.*

HON. JERRY COOK, *Judge, etc.*

*and*

APCO, *a corporation*

(No. 14262)

Decided February 13, 1979.

*Ray E. Ratliff, Jr., Kaufman & Ratliff, E. G. Marshall, Marshall & St. Clair,* for relators.

*John O. Kizer* for respondents.

*David Lycan,* amicus curiae.

NEELY, JUSTICE:

This action in prohibition challenges an order granting Appalachian Power Company a right of entry over relators' lands for construction of a high voltage power line to serve a single coal mining operation. We issued a rule to show cause limited to two questions: whether an order granting a right of entry for construction of a power line is appealable notwithstanding the fact that construction has not begun nor compensation been determined; and, whether supplying electricity to a single mining operation is a public use contemplated by *W. Va. Const.* Art. 3, § 9 and *W.Va. Code,* 54-1-2(b) [1962]. Having determined that an order granting entry in a condemnation proceeding is an appealable order and that supplying electricity to a single consumer regardless of his status as an individual or a business is a public use, the rule to show cause is discharged and the writ prayed for denied.

Pursuant to its plan to mine coal in Wayne County, West Virginia, the East Lynn Monterey Coal Company prevailed upon the Appalachian Power Company to supply power to its mine and respondent power company determined it necessary to obtain rights-of-way across relators' lands. After failing to reach an agreement with the relators concerning rights-of-way, Appalachian Power Company filed condemnation proceedings in the Circuit Court of Wayne County and obtained entry orders for the purpose of surveying and laying out the proposed right-of-way.[1] Further orders were entered authorizing

---

[1] Relators allege that the respondent power company entered upon their lands causing damage before proper authority to enter had been obtained. It is unclear whether relators allege this as a bar to the condemnation proceedings or merely in an effort at persuasion. That unlawful entry before condemnation proceedings does not act as a bar to taking is clear, *Waynesburg Southern R.R.*

Appalachian Power Company to possess, appropriate, and use relators' lands for construction and operation of an electric power transmission line and adjudicating Appalachian Power Company's right to take. Relators seek a writ of prohibition in this Court maintaining principally that the respondent judge abused his legitimate powers because supplying electricity to a single commercial enterprise is not a public use, and since the granting of a writ of entry may not be an appealable order, there is no other effective remedy to prevent irreparable damage from the judge's action in excess of his lawful powers.

I

The threshold question in this case is whether prohibition is the proper procedure to challenge the lower court's orders. It is well established that prohibition does not lie to correct mere errors and cannot be allowed to usurp the functions of appeal, writ of error, or certiorari, *Woodall v. Laurita*, 156 W. Va. 707, 195 S.E.2d 717 (1973); *State ex rel. Huntington v. Lombardo*, 149 W. Va. 671, 143 S.E.2d 535 (1965). Clearly, the lower court had jurisdiction of the condemnation proceedings, *W.Va. Code*, 54-2-1 [1923], and, unless it so exceeded its legitimate powers as to vitiate that jurisdiction, prohibition is not the proper remedy. Relators allege that there was a vitiation of jurisdiction when the lower court ruled that the taking of private property by eminent domain for construction of an electric power transmission line to serve a *single* commercial customer is a public use. We find, however, that the lower court acted properly. It is apparent to us that Appalachian Power Company is clothed with the power of eminent domain for construction of power transmission lines. *W.Va. Code*, 54-1-2(b) [1962].[2]

---

*Co. v. Lemley*, 154 W. Va. 728, 178 S.E.2d 833 (1971). The proper remedy for any damage caused would be an action at law for trespass.

[2] *W.Va. Code*, 54-1-2(b) [1962] provides that private property may be taken or damaged:

"For the construction and maintenance of telegraph, telephone, electric light, heat and power plants, systems, lines,

The only question for us to decide is whether service to one industrial customer comes within the ambit of a public use.

Interestingly, both relators and respondent call our attention to virtually the same cases, an anomaly easily understood upon examination of the precedents. All the cases stand for the broad proposition that private property cannot be taken for private use. The cases then apply that broad principle to the fact patterns presented in the cases. An examination of these cases demonstrates that the respondent must prevail on the facts before us in this case. The cited cases most analogous to the one at bar are those dealing with gas and power lines where, without exception, we have found a public use present.[3] We do not mean to imply that anything for which a power or gas company seeks to condemn private property will be considered a public use, but only that condemnations of rights-of-way to provide energy have consistently been considered by this Court as serving a public use.

The Legislature in order to make power available has conferred upon electric power companies the right of eminent domain, and has thereby necessarily imposed upon them, as public service corporations, the right and duty of performing a public service. The condemner, Appalachian Power Company, *must* supply electrical service to those who desire it and are able to pay for it; the company cannot arbitrarily discontinue service or increase the rates charged; and, the company's provision

transmission lines, conduits, stations (including branch, spur and service lines) when for public use...."

[3] *Shepherdstown Light & Water Co. v. Lucas,* 107 W. Va. 498, 148 S.E. 847 (1929); *Brooke Electric Co. v. Paull,* 96 W. Va. 645, 123 S.E. 590 (1924); *Brooke Electric Co. v. Beall,* 96 W. Va. 637, 123 S.E. 587 (1924); *West Virginia & Maryland Power Co. v. Racoon Valley Coal Co.,* 93 W. Va. 505, 117 S.E. 891 (1923); *Pittsburgh & West Virginia Gas Co. v. Cutright,* 83 W. Va. 42, 97 S.E. 686 (1918); *Carnegie Natural Gas Co. v. Swiger,* 72 W. Va. 557, 79 S.E. 3 (1913); *Pittsburgh Hydro-Electric Co. v. Liston,* 70 W. Va. 83, 73 S.E. 86 (1911); *Charleston Natural Gas. Co. v. Lowe & Butler, Trustees,* 52 W. Va. 662, 33 S.E. 44 (1901).

of service is dependent upon the will of the Legislature and, in turn, the Public Service Commission. Relators contend that service to one customer does not serve a public need; however, it is the nature of the use rather than the number of persons served which is the paramount consideration. *Waynesburg Southern R.R. Co. v. Lemley*, 154 W. Va. 728, 178 S.E.2d 833 (1971). Furthermore we find no distinction between residential and commercial users; seeking to separate the two as to which is deserving of "public use" treatment in the provision of utility services is unavailing to the relators. Appalachian Power Company makes available electrical power to all, individuals and businesses alike, and would be hard pressed to deny high voltage power to anyone along the proposed line who needed it. Undoubtedly, relators themselves are power users and would be horrified if their power service had not been forthcoming due to a recalcitrant adjacent landowner.

## II

Even if relator's allegations were correct, prohibition would be an inappropriate means to challenge an adjudication of a private condemner's right to take because such orders are appealable final orders even though they retain some characteristics of being interlocutory; therefore, complainants, such as relators, are not left without a remedy. While admittedly our language in past cases has not always been crystal clear about the time at which orders in an eminent domain proceeding become appealable, the results have been reasonable. After the right to take has been adjudicated, the meat of the case has been tried, and a writ of error should lie. Requiring *actual* entrance and use by the condemner as a condition precedent to the landowner's appeal would produce absurd results; why should litigants be required to wait until property has been used and perhaps ruined for their purposes before they can seek relief?

To the extent that any of our past language implies that the land must be *actually* taken into possession and use or compensation *actually* determined or paid before

a writ of error will lie, we declare such implications to be overruled. In all future cases, at the time the right to take has been determined the landowner can apply for a writ of error and supersedeas.

For the reasons stated above, the rule to show cause heretofore issued is discharged and the writ of prohibition prayed for denied.

*Writ denied.*

McGRAW, JUSTICE, *dissenting:*

I dissent from the majority opinion because the Court has made two mistakes. When the Court makes mistakes it should have the courage and patience to admit and rectify them.

## I

The first of the two mistakes of the Court delays justice and therefore denies the petitioner's constitutional rights.[1] Petitioners, small landowners, invoking the original jurisdiction of this Court, raised five issues in support of a writ of prohibition.[2] When the Court agreed to

---

[1] Article 3, § 17 of the *Constitution of West Virginia.*

[2] (1) The respondent, APC, exceeded its lawful powers of eminent domain by entering on certain of petitioners' lands, without their consent, prior to any court order of same; further that the respondent, Honorable Jerry W. Cook, Judge of the Circuit Court of Boone County, exceeded his jurisdiction by entering overbroad orders of entry for the purpose of survey; and that a rule issue requiring respondents to show cause what a Writ of Prohibition should not be awarded these petitioners.

(2) These petitioners are constitutionally or otherwise entitled to their day in court on the question of the right of the respondent, APC to take their property; further that such day in court has been effectively denied these petitioners; and that a rule issue requiring repondents to show cause why a Writ of Prohibition should not be awarded these petitioners.

(3) The respondent, Honorable Jerry W. Cook, Judge of the Circuit Court of Boone County, lacks jurisdiction to entertain APC's Application to Condemn petitioners' lands because APC failed to obtain a certificate of public convenience and necessity, *W.Va. Code*, §54-2-1(a); and that a rule issue requiring said respondents to show cause why a Writ of Prohibition should not be awarded these petitioners.

hear the petitioners, it acted unwisely in limiting argument[3] to what this majority now declaims to be two issues:

"The ... question ... is whether prohibition is the proper procedure to challenge the lower court's orders."

"The ... question ... is whether service to one industrial customer [is] ... a public use."

The Court refuses to consider the small landowner's claim that the court below had no jurisdiction to enter the order which the majority now says can be appealed. The small landowners say that the circuit judge lacks jurisdiction to hear the power company's application to condemn lands because the power company has failed to file a "proper" application which is necessary under the law.

The small landowners say by affidavit that the line which the power company is going to build has a potential capacity in excess of 200,000 volts and that the law requires such a line to be approved by the Public Service Commission.[4] The small landowners say, in effect, that

---

(4) The petitioners' lands sought to be condemned by the respondent, APC, are not destined for public use; and that a rule issue requiring said respondents to show cause what (sic) a Writ of Prohibition should not be awarded these petitioners.

(5) The respondent, Honorable Jerry W. Cook, Judge of the Circuit Court of Boone County, lacks jurisdiction or otherwise exceeded his jurisdiction, because APC failed to obtain compliance by the Federal Energy Regulatory Commission with the National Historic Preservation Act of 1966, 16 U.S.C. §470(f).

[3] Granted 9/18/78, limited to question as to whether order granting right of entry is appealable or proper subject of prohibition; and public versus private use, returnable on the 16th day of Jan., 1979 at 10:00 A.M.

[4] W.Va. Code, 24-2-11a, reads in its entirety:

(a) No public utility, person or corporation shall begin construction of a high voltage transmission line of two hundred thousand volts or over, which line is not an ordinary extension of an existing system in the usual course of business as defined by the public service commission, unless and until it or he shall have obtained from the public service commission a certificate of public conve-

proper procedure would entitle them to a hearing wherein their objections could be evaluated by the Public Service Commission, under the terms of *W.Va. Code*, 24-2a-11a, before the issuance of the certificate of convenience and necessity. They are, of course, right; the building of

---

nience and necessity approving the construction and proposed location of such transmission line.

(b) The application for such certificate shall be in such form as the commission may prescribe and shall contain:

(1) A description, in such detail as the commission may prescribe, of the location and type of line facilities which the applicant proposes to construct;

(2) A statement justifying the need for such facilities;

(3) A statement of the environmental impact of such line facilities; and

(4) Such other information as the applicant may deem relevant or the commission may require."

(c) Upon the filing of such application, the applicant shall publish, in such form as the commission shall direct, as a Class II legal advertisement in compliance with the provisions of article three [§ 59-3-1 et seq.], chapter fifty-nine of this Code, the publication area for such publication to be each county in which any portion of the proposed transmission line is to be constructed, a notice of the filing of such application and that the commission may approve the same unless within fifteen days after completion of publication a written request for a hearing thereon has been received by the commission from a person or persons alleging that the proposed transmission line or its location is against the public interest. If such request be timely received, the commission shall set the matter for hearing on a date within sixty days from completion of said publication, and shall require the applicant to publish notice of the time and place of hearing in the same manner as is herein required for the publication of notice of the filing of the application.

(d) Within sixty days after the filing of said application, or if hearing shall be held thereon, within ninety days after final submission on oral argument or brief, the commission may approve the application if it shall find and determine that the proposed transmission line:

(1) Will economically, adequately and reliably contribute to meeting the present and anticipated requirements for electric power of the customers served by the applicant or is necessary and desirable for present and anticipated reliability of service for electric power for its service area or region; and

(2) Will result in an acceptable balance between reasonable power needs and reasonable environmental factors.

any high tension line which has a potential capacity in excess of 200,000 volts must be considered by the Public Service Commission, otherwise the statute becomes meaningless. The determination of what high tension lines are covered must not be left to the power company for it would obviously desire to avoid the strictures of *W.Va. Code*, 24-2-11a as it has proven here.

The small landowners say that the circuit judge has no authority to enter an "order of entry" upon the power company's improper application. I agree with the small landowners that, "[f]ailure to file a certified copy of such certificate [of convenience and necessity] *shall result in a dismissal of the petition.*" (emphasis provided). *W.Va. Code*, 54-2-2a [1973].

It has been the law for at least one hundred and twenty-nine years that:

> The writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has no jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers. *W.Va. Code*, 53-1-1 [1849].

The small landowners have clearly demonstrated that the court below had no lawful authority to decree an "order of entry" because the power company, by its failure to file a certificate of convenience and necessity,

---

(e) The commission may impose conditions upon its approval of the application, or modify the applicant's proposal, to achieve an acceptable balance between reasonable power needs and reasonable environmental factors.

(f) The provisions of this section shall not apply to the construction of line facilities which will be part of a transmission line for which any right-of-way has been acquired prior to the first day of January, one thousand nine hundred seventy-three.

(g) The commission shall prescribe such rules and regulations as it may deem proper for the administration and enforcement of the provisions of this section, which rules and regulations shall be promulgated in accordance with the applicable provisions of chapter twenty-nine-A [§ 29A-1-1 et seq.] of this Code as if the same were set forth herein in extenso. (1973, c. 112).

failed to file a "proper" application. Failure to file a proper petition "shall result in a dismissal of the petition." The court below denied the small landowners, the little man, due process of law. Prohibition should lie.

## II

The second mistake which the Court has made was its refusal to take the time to consider the *Amicus Curiae* Brief prepared by two eminent Professors of Law of West Virginia University. If the Court had taken the time, the *Amicus Curiae* Brief could have provided the Court with insight into the origins of eminent domain and modern American law on "public use."[5]

To the Court's thought-free pronouncement of today, the Professors McGinley and Cady, perhaps anticipating the outrage,[6] wrote an apt reply:

---

[5] In order to make the Bench and Bar more familiar with the origins of and current direction of eminent domain law as herein discussed, I am including as Appendix A the arguments contained in the brief which the Court refused to consider. I am also including as Appendix B the succinct argument from the *Amicus Curiae* Brief filed by Mr. David Lycan, Counsel for te Wayne County Commission, which was considered and which illustrates the social context in which the Court decided this case.

[6] My view is neither new nor original. Judge Brannon, noted and lauded for his judicial support of industrial development, said, dissenting in *Coretta v. Ry. Co. v. Virginia-Pocahontas Coal Co.*, 62 W. Va. 185, 194-95, 57 S.E. 401, 404 (1907), that:

On the facts I hold that the purpose for which it is proposed to condemn the land is not public, but private; that this railroad was projected, not to serve the general public, but simply and only to enable the Pocahontas Coal Company to get its coal and timber to market, and that the railroad really and truly subserves no public want or need or behest. The coal company likely failing to agree with the land owner as to price for right of way, invokes the power of the state to accomplish the result which it could not accomplish by contract. The power of the state under eminent domain cannot be perverted to such use. Sacred, next to life, in this free land, is ownership of land, on which to live, from which to earn bread, in which to rest at last. The noble American Constitutions tell legislatures and courts, that private property shall be taken only to answer public need, never to subserve private need, no matter how great that private need may be.

Under the guise of "public use," Appalachian Power Company is seeking to benefit the private interests of its own stockholders.

The public has no interest in or need for the expansion of electric transmission lines which will serve only one coal company; [particularly, as here, where electric service already exists]; rather, the public is harmed in that citizens are being deprived of their constitutionally-protected property rights. Due process requirements should, therefore, attach, and the Court should vigorously review each such condemnation to ensure that the delegee has not abused its discretion, but has chosen the alternative most beneficial to the public that it is bound to serve.

## III

These landowners are surely people of modest means. Their financial ability to support lawyers in protracted litigation is limited, particularly when compared to the rich and powerful power company which, with its relatively unlimited assets, can sustain almost endless litigation.

While the small landowners might appeal the failure of the power company to comply with the law which requires a certificate of convenience and necessity, they are denied justice this day. The power company gets a great deal more than it deserves, including the right of entry to private property, but the small landowners, the people, get virtually nothing.

## APPENDIX A

## ARGUMENT

## I. PREFACE

An appropriate and just resolution of the rights and remedies of the parties in the case at bar necessarily requires this Court to analyze the historical underpinnings of the concepts of "public use" and "eminent domain." It is necessary to put these terms in historical context because they are used in the instant case to

facilitate the taking of private property by another private citizen—a profit-making corporation; this procedure would never have been contemplated by the framers of our federal Constitution.

## II. RESPONDENT POWER COMPANY IS EXERCISING ITS LEGISLATIVE GRANT OF THE POWER OF EMINENT DOMAIN IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS AND STATE STATUTES IN THAT THE TAKING IS FOR AN ESSENTIALLY PRIVATE PURPOSE FOR WHICH NO NEEDFUL PUBLIC PURPOSE IS THEREBY SERVED.

### A. *Historical Basis of the Public Use Requirement*

The notion that the power of eminent domain was an inherent right of a sovereign state was articulated by the seventeenth century philosopher/attorney Hugh Grotius, *De Jurre Belli et Pacis, Lib. III*, C. 20 § 7. Maitland neatly summarized this theory in the statement:

> All land in England must be held of the King of England, otherwise he would not be the King of all England. To wish for an ownership of land that shall not be subject to royal rights is to wish for a state of nature. 2 Pollock, Maitland, *The History of English Law*, (1895).

While the right of the federal government to exercise the power of eminent domain to take private property was not explicitly confirmed by the Constitution, it was implicitly recognized in the Bill of Rights. The Fifth Amendment commands that:

> ... nor shall private property be taken for public use, without just compensation. *U. S. Const.* Amendment V.

It has been suggested that it was James Madison, a principal draftsperson of the Bill of Rights, who incorporated "public use" and "just compensation" requirements in the Fifth Amendment. Grant, "The Higher Law Background of Eminent Domain," 6 *Wis. L. Rev.* 67 (1931). The inclusion of such restrictions on the "taking"

power of a sovereign was not a new concept. Rather, it may be traced as far back as the equitable judicial policies of the Roman Empire in the second century B.C.:

> The Roman Senate—possibly as the result of experiences with private property owners of land— passed a decree that private property could be taken for public use, upon an estimate being made therefore by *good men*. (emphasis in original) Watson, III *The Constitution of the United States*, at 1458-1459, (1910).

A similar limitation is found in the Napoleonic Code to the effect that "(n)o one can be compelled to give up his property except for the public good, and for a just and previous indemnity." *Code of Napoleon*, Art. 454, *Magna Carta*, Lord Coke's *Institutes* and Blackstone's *Commentaries* also are said to have provided precedent for the Fifth Amendment's "public use" and "just compensation" provisions. See Nichols, 1 *The Law of Eminent Domain*, § 4.1, (1970); Bosselman, *The Taking Issue*, at 89, (1972).

Thus, an historically recognized principle of law was incorporated into the Fifth Amendment as a restriction on the implicit sovereign power. *See e.g., Boom Co. v. Patterson*, 98 U.S. 367 (1878); *Kohl v. United States*, 91 U.S. 367 (1875).

B. *Delegation of the Power of Eminent Domain to Public Agencies*

While the exercise of the power of eminent domain was early recognized as an inherent sovereign power of the federal government, the thought that such a power could be formally delegated by the legislature did not arise until the middle of the nineteenth century. *See e.g., People v. Smith*, 21 N.Y. 595 (1860); *Mitchell v. Harmony*, 13 How. 115, 139 (U.S. 1850).

The generally accepted rationale behind delegation of the power of eminent domain was that execution of the laws is not a legislative function. Randolph, *The Law of Eminent Domain*, at 94 (1894). It was argued that com-

mon sense dictates that it would be impractical to have the legislature steeped in the details of every condemnation. *See, In Re Bangor Hydro-Electric Co.,* 314 A.2d 800 (Me. 1974); *County of Freeburn v. Bryson,* 210 N.W.2d 290 (Minn. 1973); *Citizens for Hudson Valley v. Volpe,* 302 F. Supp. 1083 (S.D.N.Y. 1969}; *but see, Boom Co. v. Patterson,* 98 U.S. 403 (1878). The statutory delegation of the sovereign power of eminent domain by the legislature to public agencies was the logical offshoot of the growing complexity of government. Within the limits drawn by the delegating statute, the public delegee was entitled to make determinations relating to whether the power will be exercised, when it will be exercised and to what extent it will be exercised in a given situation. *See,* Lewis, 1 *A Treatise on the Law of Eminent Domain,* § 370 (1909); Nichols, *supra,* § 3.21 (3).

## C. *Expansion of the Public Use Requirement*

At the same time the statutory delegation of the eminent domain power was meeting growing acceptance, the parameters of the concept of "public use" were undergoing considerable expansion. At the time of the adoption of the Fifth Amendment, public use was strictly construed to mean literally that the land had to be used or occupied by the public; takings for roads, canals, or public parks would be examples of such uses. *See,* Note, "The Public Use Limitation on Eminent Domain, 58 *Yale L. J.* 599, 602, (1949).

The rationale for strict construction of the term "public use" was based principally on three considerations: (1) The accepted practice at the time the Fifth Amendment was drafted was that private property could only be taken for mill dams, rights of way and in cases of extreme public necessity, *See,* Lewis, 1 *Eminent Domain,* at 506 (1909). The eminent domain power was therefore read as distinct from other state police powers with an eye towards "a public purpose which justifies the preogative of sovereignty invoked ..." *Matter of Niagra Falls and Whirlpool R.R. Co.,* 135 N.Y. 375, 379, 15 N.E. 429, 432 (1888). (2) Strict construction is the most

logical interpretation of the word "use." Lewis, 1 *Eminent Domain*, at 506 (1909). (3) A strict reading of "public use" makes the takings provisions more discriminating and gives it effect as a constitutional restriction on the eminent domain power, thus vindicating the intent of the framers. *Id.*

The rule of strict construction of the public use requirement was steadily eroded in the federal courts and many state courts. This erosion has been attributed to:

> (t)he expanding social philosophy of the present century (which) has brought in the courts an almost complete abandonment of the "use by the public" test. *See*, Note, "The Public Use Limitation on Eminent Domain," 58 *Yale L. J.* 599, 607 (1958); Project, "The Private Use of Public Power," *27 Vand. L. Rev.* 681, 702 (1974).

This expanding social policy refers in large part to the use of the eminent domain power to force government-sanctioned redevelopment of urban slums. This expansion of "public use" received its greatest boost in *Berman v. Parker*, 348 U.S. 26 (1954), which approved a federal urban renewal project as a "public benefit," casting aside the narrower "public use" mandate because the police power as well as the power of eminent domain was involved.

The expansive view of public use should not be followed by this Court in cases, as here, where the police power is not involved. This Court must limit the abrogation of the strict "public use" requirement to situations as in *Berman* where eminent domain is exercised as a corrolary to the police power in warding off threats to public health, safety and welfare. This Court has generally continued to apply the rule of strict construction. *See* cases cited, Brief of Relators, at 9-18.

D. *Legislative Delegation of the Power of Eminent Domain to Private Corporations*

Contemporaneous with the erosion of the "public use" requirement was the expansion of the trend of statutory

delegation of the condemnation power. State legislatures began to bestow condemnation authority on *private* corporations as well as public agencies; railroads, private utility companies, mining companies and others were the recipients of such statutory authority. The impetus for delegation to public agencies and private corporations is attributed to the rise of the "Industrial Revolution" in the latter half of the nineteenth century. Thus, an early state decision approving the condemnation of property for a drainage tunnel for deep mining held that:

> the definition of public use must be such as to give it a degree of elasticity capable of meeting new conditions and improvements and the ever increasing needs of society. *Tanner v. Treasury Tunnel and Reduction Co.*, 35 Col. 593, 83 P. 464 (1906).

E. *The Constitutional and Statutory Requirements of "Public Use" Must Be Given Effect in This Case*

While the statute in question in the case at bar purports to delegate the power of eminent domain to, *inter alia,* private profit-making corporations, the judicial inquiry to determine compliance with the constitution and the statute must be a rigorous one if the term "public use" is to have any meaning at all. The statutory provision which extends the power of eminent domain to private corporations such as Appalachian Power Company is Section 2, Article 1, Chapter 54 of the West Virginia Code Annotated.

> "The public uses for which private property may be taken or damaged are as follows:
>
> "* * *
>
> "(b) For the construction and maintenance of telegraph, telephone, electric light, heat and power plants, systems, lines, transmission lines, conduits, stations (including branch, spur and service lines), *when for public use;*" (emphasis added) *W. Va. Code,* § 54-1-2.

The pertinent state constitutional provisions limiting this power are found in Article III of the West Virginia Constitution:

> "§1. All men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter a state of society, they cannot, by any compact, deprive or divest their posterity, namely: the enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety.
>
> "* * *
>
> "§9. Private property shall not be taken or damaged for public use, without just compensation; ..." *W. Va. Const.* Article III.

Also relevant are the following clauses of the Fifth Amendment to the Constitution of the United States:

> No person shall be ... deprived of ... property, without due process of law, nor shall private property be taken for public use, without just compensation. *U.S. Const.*, Amend. V.

The Fifth Amendment has, of course, been made applicable to the states by virtue of the due process clause of the Fourteenth Amendment.

Respondent contends that it is a public service corporation engaged in the generation of electric power, which has been determined by the legislature to be a public use. Respondent argues that by virtue of the business it is in the legislature must have recognized that it acts in the public interest. This view is underscored by the inadequacy of Appalachian Power Company's pleading in the Court below. Respondent baldly asserted in its condemnation petition that the taking it sought was for a "public use"; nothing further was alleged.

Respondent appears to have smugly assumed that a self-serving declaration of public use without more is tantamount to compliance with § 54-1-2 of the West Vir-

ginia Code and the state and federal Constitutions. Such an assumption is clearly erroneous.

F. *The Public Use Requirement of Section 54-1-2 Must be Strictly Construed.*

Respondent's peremptory distain for the public use requirement of § 54-1-2 is presumptuous in the extreme. Respondent's incorrect assumption that legislative authorization to take is concomitant with a determination that the use is a public one ignores the limitation found in the delegating statute that the power is granted when the taking is "for public use." *W. Va. Code*, § 54-1-2. Such language would be mere surplusage if every taking by a delegee were automatically deemed to be for a public use. This language was recognized as a limitation of the right to condemn in *Charleston Natural Gas Co. v. Low*, 52 W. Va. 662, 44 S.E. 410 (1901), where the Court noted that "when for a public use" qualified the right to condemn.

This Court must give full force and effect to this statutory restriction of the right to condemn. In so doing the Court will find that the meager record in this case establishes beyond doubt that this is a condemnation by a private, for-profit business for the transmission of electric power to another private, for-profit business. To assert that any direct public benefit will be derived by the taking is to ignore who the true benefactors of the condemnation will be. To hold that the legislature has sanctioned such action is to make a mockery of the limiting language in the authorizing statute.

G. *A Utility Company's Inferior Right to Condemn Should Be Subject to Rigorous Judicial Review Due to the Potential for Abuse Inherent in the Unrestrained Exercise of the Power of Eminent Domain by a Non-Public Entity.*

When the power of eminent domain is delegated to a private entity, particularly one which is profit motivated, there is increased potential for abuse of discretion due to unavoidable conflicts of interest. A private, inves-

tor-owned corporation such as Appalachian Power Company is, by its nature, motivated by its private duty to be profitable as well as its public duty to provide necessary services.

Historically it is easy to understand why the courts have been liberal in what they deemed to be a public use. The rise of industrialization and the increasing public demand for transportation, natural gas and electricity made it a simple matter for the public use test to be met. Such is not the case today. No longer is it necessary to blindly promote industrial expansion at the expense of individual rights. Most residents of the State of West Virginia can presently be supplied with electricity, and the time has come for the Court to strictly scrutinize a utility company's exercise of its right of eminent domain to ensure that it is one demanded and needed by the public. Although an increase in service may at one time have been automatically deemed beneficial to the public, this is no longer true since oftentimes the deleterious environmental effects and the invasion of constitutionally-protected private property rights far outweigh any indirect public advantages which may result from the expansion. Just as industrialization expanded the concept of public use, the potential abuse of the power of eminent domain must result in rigorous judicial scrutiny in the context of takings by private, for-profit entities.

The fundamental distinction between government entities and private corporations in their respective exercise of the power of eminent domain was well expressed in *West Virginia Board of Regents v. Fairmont, Morgantown & Pittsburgh R.R.*, 155 W. Va. 863, 189 S.E.2d 40 (1972):

> "The right of the state to condemn is an attribute of sovereignty, while the power of utilities to condemn is granted by legislative act. *The right of the state is therefore superior to that of the utility.*" (emphasis added)

Recognition of this distinction is a step towards effective judicial review. It is a universally accepted principal that statutory delegations of the power of eminent do-

main are construed strictly against the delegee. *See, Delaware, L & W R.R. Co. v. Morristown,* 276 U.S. 182 (1927).

The rationale behind this rule of construction is that the taking of private property for a public use is unavoidably deemed to be against the common right and authority; so to do must be clearly expressed. The burden of proving that the proposed exercise of the power is within the scope of the delegating statute either expressly or by necessary implication must therefore be placed on the delegee. *See, e.g., Arkansas State Hwy Comm. v. Morgan's Estate,* 243 Ark. 450, 420 S.W.2d 525 (1965). It should be noted that when the state or its officials are employing the power of eminent domain the rule of strict construction has been held not to apply. *See, e.g., City of Palm Bay v. General Dev. Utilities, Inc.,* 201 So.2d 912, 914 (Fla. 1967). Thus, some courts have rightly recognized the public/private dichotomy and apply the rule of strict construction on the basis of the character of the delegee. The rule of strict construction can provide an effective judicial framework for review of the possibility of abuse where a delegee has a substantial private interest involved; the rule can serve as a basis for the Court to strictly scrutinize the exercise of the power of eminent domain by a non-public entity.

As early as 1906 a perceptive judge dissented from the majority's determination that a proposed railroad was for a public use:

'The Pocahontas Coal Company could not condemn the land in its name and resorts to a railroad charter to attain the end ... The power of the state under eminent domain cannot be perverted to such use." *Carretta R.R. v. Virginia Pocahontas Coal Co.,* 62 W. Va. 185, 57 S.E. 401 (1906).

Where private interests will primarily be promoted by the condemnation, the Court must effectively review the taking and deny the right where the purpose for the taking is private or is its chief inducement or incentive for appropriation. *See, Gauley & Summersville R.R. v.*

*Vencill,* 73 W. Va. 650, 80 S.E. 1103 (1914). The burden of proving "public use" should be placed on the private delegee who should prove it by a preponderance of the evidence. In addition, the Court should balance the social utility of the proposed condemnation with the property rights of the individual landowner. *See,* "Public Use as a Limitation on the Exercise of the Eminent Domain Power by Private Parties," 50 *Iowa L. Rev.* 799 (1965). Such a balancing would give the Court a more substantial role in reviewing condemnations brought by private delegees of the power pursuant to a general statutory delegation. Moreover, such a balancing process would put private delegees on notice that they will have to be able to justify their proposed condemnation in terms of the public use requirement.

H. *Both the Federal and State Constitutions Mandate Substantial Due Process Protection in Cases Where Private Profit-Making Entities Have Been Delegated the Power of Condemnation.*

The protection of private property rights secured by our state and federal constitutions will fall victim to a grossly distorted view of medieval notions of sovereignty if the Court here defers to the discretion of private corporations. Would the framers of our Constitutions have intended that citizens' private property rights could be taken by private, for-profit businesses without any type of protection against arbitrary or capricious action? Would the leaders of the American Revolution have condoned a procedure such as that advanced in the case at bar, having fought the authoritarian repressions of the English sovereign? Would Madison or Jefferson have intended that the due process protection of private property rights contained in the Fifth Amendment be inapplicable to a private corporation's delegated condemnation power? A better question perhaps would be whether the framers would have tolerated at all the unbridled exercise of a sovereign power by a private, profit-making corporation? The answers to these questions are obvious to all who have a passing acquaintance with constitutional history. The delegation to and exercise of the pow-

er of eminent domain by private, for-profit entities were simply never a part of the notions of sovereignty which were recognized by the framers. In this context, if a private corporation has no constitutional constraints except that its action be declared by the legislature to be for a "public use" the Bill of Rights would be a dead letter. Sovereignty must have its limitations in our system of government; in the case at bar, exercise of this type of power is inherently in conflict with the constitutionally-protected right of citizens to hold and enjoy private property.

Surely due process guarantees should be afforded property owners whose land is sought to be taken under the power of eminent domain. Any delegee attempting to exercise its power of eminent domain should be required to compile evidence addressing the public need which is being filled by the condemnation, the merits of all feasible alternatives to the taking, and the reasons for choosing the particular alternative adopted. The delegee should be required to submit data similar to that required by the National Environmental Policy Act, which should fully reveal the possible impacts of the proposed condemnation. *See,* U.S.C. § 4332 (c). That public utilities are capable of abusing the monopolistic powers granted them is evidenced by the myriad statutes and regulations that have proved necessary to curtail them. The Court must not defer to private corporations' discretion where the potential for abuse is perhaps greatest—the taking of a person's private property against his will.

## APPENDIX B

### ARGUMENT

*The use of the land sought to be taken for the construction, maintenance and operation of an electric power transmission line is a public use for which private property may be acquired by eminent domain.*

Your Amicus is informed that a coal company or companies has spent many millions of dollars in preparing

to open a large coal mine near East Lynn in Wayne County, West Virginia; that such coal mine is expected to produce approximately two million tons of coal annually and to employ ultimately approximately 800 workmen at its mine; that such company is now in the process of employing workmen; that such company plans to open such mine and to employ many workmen within approximately four months; that such operation is in dire and immediate need of electric power which would be provided by the power line now under construction and that such coal company may be unable to operate such mine unless and until such power line is completed.

Your Amicus is further informed that such coal mine is expected to ultimately have a payroll in Wayne County of more than $15,000,000 annually and that such employment and payroll will be of great benefit to the economy of the county and to the citizens and residents thereof, particularly whose who would be employed in and about such mine. Your Amicus further says that the taxes which would be payable by such coal company in Wayne County when it is in operation will be of vital importance to the school system and the government of Wayne County.

W. Va. Code § 54-1-2(b) makes it clear that private property may be taken or damaged for construction and maintenance of electric power transmission lines and that such use is a public use.

The question of public versus private use raised in this proceeding has been squarely answered in favor of Respondent power company in the recent case of *Waynesburg Southern R.R. Co. v. Lemley,* 154 W.Va. 728, 178 S.E.2d 833 (1970), where this Court affirmed the right of a railroad company to acquire necessary rights-of-way by eminent domain to serve only two major coal companies operating in the area. The *Lemley* case also affirms a long line of well reasoned authority not only in this State but throughout the country which recognizes that public versus private use is to be determined by the character of the use and not by the number of persons

who avail themselves thereof. The character of the use of the proposed power line involved in this proceeding is unquestionably public even where only one person will directly avail itself of the use of such line at the present time. A contrary holding by this Court would have a devastating effect on the citizens and residents of Wayne County and bring to a virtual standstill the long awaited area development and improvement to be generated by one specific coal company's activities and many others similarly situated who plan for public utilities to be able to provide essential services.