423 S.E.2d 884

**POTOMAC VALLEY SOIL CONSERVATION DISTRICT, a public body corporate under the laws of the State of West Virginia, Plaintiff Below, Appellant,**

v.

**Wanda E. WILKINS, et al., Defendants Below, Appellees.**

**No. 20727.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 9, 1992.

Decided Nov. 12, 1992.

Howard E. Krauskopf, See, Walters & Krauskopf, Moorefield, for appellant.

James Paul Geary, James Paul Geary, II, Geary & Geary, L.C., Petersburg, for appellees.

BROTHERTON, Justice:

The Potomac Valley Soil Conservation District (PVSCD), appeals from an August 26, 1991, final order of the Circuit Court of Hardy County denying the PVSCD the relief it requested in applications in which it sought to exercise the power of eminent domain and condemn certain land for public use.

The appellant, PVSCD, is a public body corporate, and a political subdivision of the State of West Virginia. The district is comprised of elected landowners from a five-county jurisdiction: Mineral, Hardy, Grant, Pendleton, and Hampshire counties.[1] The soil conservation district's statutory mandate is to provide for the conservation of West Virginia's soil and soil resources, for the control and prevention of flood water and sediment damage, and for furthering the conservation, development, utilization, and disposal of water.

The appellees herein are property owners and others with interests in real estate, portions of which the PVSCD is seeking to utilize by exercising its statutory power of eminent domain.

At the center of the conflict in this case is a proposed flood control dam to be located on Kimsey's Run, a tributary of Lost River, in Lost River District, Hardy County, West Virginia. This project has been officially designated as the Lost River Subwatershed of the Potomac River Watershed Project Flood Water Retarding Dam No. 4. A flood control project consisting of five dams to be located in the Lost River area was initially developed in 1974, but those plans were never implemented. After severe flooding occurred in the region in November, 1985, interest in the project was renewed. Evaluations completed in 1974 are still applicable.[2] However, revised plans now call for a dual strategy recommended by the Soil Conservation Service to combat the effects of flooding: (1) improving farming practices that reduce run-off and erosion, and (2) building one flood control dam.

On June 13, 1990, the appellant instituted nine condemnation applications related to this project. A hearing was held on June 29, 1990, at which time the intervenor herein, a citizens group organized as the Lost River Committee, voiced its opposition to the flood control plan.[3] The circuit court withheld a decision on whether to grant the requested land rights so that the Lost River Committee could have an opportunity to investigate and justify their objections to the project. An extensive discovery process followed, and several additional hearings were held.

The circuit court issued a written opinion on June 26, 1991, and entered a final order on August 26, 1991. Among its findings, the court stated that (1) the PVSCD is vested with the right of eminent domain for certain specified public purposes by the laws of this State;[4] (2)the PVSCD sought to condemn land in the Kimsey's Run Wa-

---

1. Altogether, there are fourteen soil conservation districts statewide which are created under W.Va.Code § 19–21A–2(d) (1991). The State Soil Conservation Committee (SSCC), comprised of three appointed and four designated members, obtains state funding and coordinates the activities of the districts. The federal Soil Conservation Service provides federal funding and technical assistance.

2. The original planning for the project began in 1968, and actual operations were authorized on February 11, 1975.

3. The intervenors have no legal interest in the real estate being sought in the applications for rights-of-entry.

4. Under W.Va.Code § 19–21A–8(5), the PVSCD has the power "... to institute condemnation proceedings to acquire any property, real or personal, or rights or interests therein, ... required for works of improvement; to construct, improve, operate and maintain such structures as may be necessary...."

tershed of Lost River for the specific purpose of flood control, and this purpose is one of the public purposes for which the PVSCD is vested with the right of eminent domain; and (3) the PVSCD had shown a need for the project for the specified purpose.

In spite of these findings, the PVSCD's applications to acquire certain lands, rights-of-way, and easements were denied. Among its other findings, the circuit court also concluded that (1) the PVSCD should not have requested fee acquisitions in two of the applications because permanent easements were more appropriate; (2) the PVSCD incorrectly determined the amount of land necessary to accomplish the purpose of flood control protection; and (3) the PVSCD's attempt to allow the Department of Natural Resources (DNR) to utilize the proposed sixty-six acre permanent flood pool for public fishing purposes was an abuse of discretion.

According to the appellants, fourteen tracts of land are affected by the project. The PVSCD negotiated easements and fee acquisitions for all but five of these tracts. Of the five remaining landowners, three oppose the project, while two object to the monetary offer.

The PVSCD believes that the majority of the watershed's residents are either in favor of or do not oppose the project, but they admit that they "have not gone to the great effort employed by the opposition to rally support for their position and pack the courtroom at each hearing." As the appellants properly point out, however, the popularity of the proposed project should not be a guiding factor in the decision-making process in this case.

Significantly, the court below determined that the PVSCD seeks to condemn the land in question for a "public use" for which there is a specific need and that this is one of the public purposes for which the PVSCD is vested with the right of eminent domain. The court also acknowledged that the PVSCD "has the right to condemn such interest and property necessary for its flood control purposes and incidentally thereto to use the flood control project for recreational purposes."

However, the court concluded that the PVSCD "has no right to condemn any interest or property for recreational purposes and incidentally thereto use the same for flood control purposes as is the case in this action." The circuit court found that the PVSCD's "proposed project and taking of private property greatly exceeds that required to accomplish its stated purpose, i.e., flood control." This was quite obviously the major reason that the PVSCD's condemnation applications were denied. However, we do not agree that the evidence in the record supports the three findings upon which the lower court based such a conclusion.

After careful review of the record in this case, it is this Court's conclusion that the lower court erred in denying the PVSCD's condemnation applications because there was insufficient evidence to justify such a decision. Moreover, we believe there was evidence of what the PVSCD described as an "obvious predisposition" by the court below against the PVSCD's exercise of the power of eminent domain. For example, the lower court opined that the power should be a community right, and also stated that the Legislature has "gone wild with that grant of the right to condemn."

Several additional issues were raised in this case, some of which were related to the funding of this project. However, in this opinion, we will address only the specific reasons identified by the court below as the basis for its denial of the PVSCD's applications.

First, the court stated that the PVSCD wanted to take an estate in fee simple rather than a lesser estate even though the latter would "fully and adequately serve [the PVSCD's] purpose and would be the only interest of which the owners should properly be deprived."

The PVSCD maintains that its decision to obtain fee interests in property which was either permanently covered by water, under the dam itself, or under the relocated road, was its attempt to address access objections raised by landowners and com-

pensate landowners to the fullest extent possible. The PVSCD outlined some of its reasons for preferring to take fee title in a February 6, 1991, letter that PVSCD Chairman J. Richard Campbell directed to PVSCD counsel:

As requested by Judge Hamilton at the recent land rights hearing for Dam No. 4, Lost River Watershed, the Potomac Valley Soil Conservation District has reviewed the option of taking easement for flood prevention at this site rather than fee title. We share his concern of not adversely affecting the integrity of the valley. After thorough review, the District still believes the present option of taking fee title is best for the following reasons:

1. The Board does not believe, based on use at similar sites, that the development of the lake for fishing will cause a negative change to the Lost River Valley. Incidental fishing will compliment the Valley and its present setting.

2. In 1976 the Board proposed to secure easements at this dam. At that time, the local people of Lost River expressed strong objection to maintaining the site in private ownership and allow private individuals to receive benefit. We agreed and developed plans to incorporate this change into the land rights.

3. Nine of 13 landowners have expressed a desire to sell their land in place of granting an easement.

4. The cost of securing an easement based on appraisal value is approximately the same cost as a fee take.

5. Based on our assessment of public opinion, the Board firmly believes the majority of the people in Lost River support the construction of this project and wish to have Dam No. 4 open to the public.

Based on overall good and public benefit for Lost River, the Board voted at its February 6, 1991 meeting to maintain the project as now proposed.

■ It appears as though the lower court overstepped its judicial boundaries when it concluded that the PVSCD's proposal to take fee title to certain properties was unwarranted. Once the statutory power of eminent domain has been conferred upon an agency, a court's inquiry into the scope of such power is limited solely to the question of whether it is to be exercised in order to provide a public service.

■ As we have already pointed out, the lower court did in fact find that the PVSCD sought to exercise its statutory right of eminent domain in order to provide a public service. In syllabus point 3 of *Pittsburg Hydro–Electric Co. v. Liston*, 70 W.Va. 83, 73 S.E. 86 (1911), this Court stated that in eminent domain proceedings, *"[c]ourts are limited in their inquiry* to the question whether the particular service provided for is a public service." (Emphasis added.) "Whether it is expedient, appropriate, or necessary to provide for a public service of a particular kind or character is a legislative, not a judicial, question." *Id.* at syl. pt. 2. In *Charleston Natural Gas Co. v. Low, et al.*, 52 W.Va. 662, 664, 44 S.E. 410, 411 (1901), we continued:

When the court has determined that the use for which property is condemned is a public use, its judicial function is gone, and the legislative discretion is unrestrained. Whether the proposed plan will accomplish the end proposed, or to what extent it will be beneficial to the public, are not matters to be determined by the courts. These are matters belonging to the legislative discretion.

Citing *Varner v. Martin*, 21 W.Va. 534 (W.Va. 1883); *see also, State v. Professional Realty Co.*, 144 W.Va. 652, 657–658, 110 S.E.2d 616, 620 (1959).

■ This Court has also addressed the question of the amount of land that an agency can take in a condemnation proceeding. In syllabus point 1 of *Mr. Klean Car Wash, Inc. v. Ritchie*, 161 W.Va. 615, 244 S.E.2d 553 (1978), we recognized that " '[t]he sole discretion to determine what quantity of land is necessary for a public use is vested in the agency resorting to eminent domain, which discretion will not be interfered with by the courts unless it

has been abused.' Syllabus Point 2, *State v. Bouchelle*, 137 W.Va. 572, 73 S.E.2d 432 (1952)." We also stated that " '[a]ny corporation or body politic authorized to acquire private property for public use pursuant to the provisions of Chapter 54, Code, 1931, as amended, may acquire an estate in fee simple, *or any lesser estate therein.*' Syllabus Point 4, *Board of Education v. Shafer*, 147 W.Va. 15, 124 S.E.2d 334 (1962)." Syl. pt. 2, *Mr. Klean Car Wash, Inc. v. Ritchie*, 161 W.Va. 615, 244 S.E.2d 553 (1978). In this case, there is no evidence that the PVSCD abused its discretion in its decisions regarding the land acquisitions in question. Under the circumstances, we believe the decisions made by the PVSCD were reasonable and in no way arbitrary or capricious.

■ The circuit court's second and third objections to the PVSCD's proposal related to the size and use of the permanent pool. The court found that the PVSCD abused its discretion because the proposed sixty-six acre area "greatly exceeds that necessary to accomplish [the PVSCD's] purposes." The lower court also determined that recreation was the primary purpose of the permanent pool, and that the pool was to be used only incidentally for a sediment reservoir.

We disagree with the lower court's finding that the PVSCD abused its discretion in that it attempted to condemn land for recreational purposes by proposing a permanent flood pool in excess of the project's flood control purposes. The PVSCD maintains that the size of the lake was determined "purely by engineering necessity in order to provide the needed flood protection," and that a secondary and incidental use of the pool may be for public fishing. Although the PVSCD presented some evidence which indicated a need for a sixty-six acre pool,[5] the appellees offered nothing to contradict these specifications. According to the PVSCD, this issue was never even

disputed in the proceedings below, and we believe that it was wrongly utilized by the court below as a major basis for its denial of the condemnation applications.

For the foregoing reasons, the August 26, 1991, order of the Circuit Court of Hardy County is reversed.

Reversed.

---

5. James Clevenger, the leader of this project on the SCS Water Resources Planning staff, testified as to the means by which the engineering and technical analysis was undertaken in order to determine the size and location of the flood control structure. The PVSCD states that if it had known that the size of the permanent pool would be an issue or of concern to the circuit court, or if it had been raised by the opposition, then "[t]he PVSCD could and would have provided extensive testimony with regard to why the permanent impoundment must be 66 acres."