# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2016 Term

_____

No. 15-0342

_____

**LORETTA LYNN GOMEZ,**
**Petitioner**

v.

**KANAWHA COUNTY COMMISSION**
**Respondent**

_____

Appeal from the Circuit Court of Kanawha County
The Honorable James C. Stucky, Judge
Civil Action 13-P-327

**AFFIRMED, IN PART, REVERSED, IN PART,**
**AND REMANDED**

_____

Submitted: April 27, 2016
Filed: June 3, 2016

FILED
June 3, 2016
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Shannon M. Bland, Esq.                     Charles R. Bailey, Esq.
Bland and Bland Attorneys at Law           Kelly C. Morgan, Esq.
Charleston, West Virginia                  Daniel T. LeMasters, Esq.
Counsel for the Petitioner                 Bailey & Wyant, P.L.L.C.
                                           Charleston, West Virginia
                                           Counsel for Respondent

**CHIEF JUSTICE KETCHUM delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.    In a condemnation proceeding, the circuit court is charged with determining whether the applicant has a lawful right to take property for the purposes stated in the condemnation petition.  The circuit court determines, as a matter of law, whether a property may lawfully be taken.  The property may lawfully be taken if the applicant's expressed use of the property is, in fact, a public one, and the condemnation is not impelled by bad faith or arbitrary and capricious motives.

2.    "The question what is a public use is always one of law."  Syllabus Point 2, in part, *Hench v. Pritt*, 62 W.Va. 270, 57 S.E. 808 (1907).

3.    "The measure of just compensation to be awarded to one whose interest in real estate is taken for a public use in a condemnation proceeding is the fair market value of the property at the time of the taking."  Syllabus Point 1, *W.Va. Dep't of Transp., Div. of Highways v. Western Pocahontas Properties, L.P.*, 236 W.Va. 50, 777 S.E.2d 619, 626 (2015), cert. denied sub nom. *Beacon Res., Inc. v. W.Va. Dep't of Transp., Div. of Highways*, 136 S. Ct. 1453 (2016).

4.    Under the project influence rule, any increase or decrease in value to the condemned land that is directly attributable to the project for which the land is taken must be disregarded in determining the market value of the land.

i

Chief Justice Ketchum:

Condemnation actions are *sui generis*, unique and peculiar, when considered against other civil actions. The *West Virginia Constitution* provides that, when land is taken or damaged for a public use, just compensation shall, "when required by either of the parties . . . be ascertained by an impartial jury of twelve freeholders."[1] In this appeal from the Circuit Court of Kanawha County, we are asked to examine a circuit court's entry of summary judgment against a landowner in a condemnation proceeding.

As we discuss below, the parties and the circuit court acknowledged that the landowner had asked for a jury trial, and that the landowner was prepared to offer her opinion as to the value of the land taken. The circuit court therefore erred in granting summary judgment against the landowner.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

The respondent, the Kanawha County Commission ("the Commission"), is a member of the Central West Virginia Regional Airport Authority ("the airport authority").[2] The airport authority owns and operates Yeager Airport.

---

[1] W.Va. Const., Art. III, § 9.

[2] The board of the Central West Virginia Regional Airport Authority is comprised of representatives of Kanawha, Putnam, Lincoln, Boone and Nicholas Counties and the City of Charleston. *See generally* W.Va. Code § 8-29-1 [1969] ("Any two or more municipalities, any two or more contiguous counties, or any county or two or more contiguous counties and one or more municipalities located therein or partly therein, of this State, are hereby authorized to create and establish one or more authorities

(continued . . .)

Southwest of Yeager Airport, and near the flight path of planes using the airport's runway, was a high hill in the Coal Branch Heights neighborhood of Charleston. The high hill was about 200 feet higher than Yeager Airport's runway. In 2012, at the behest of the Federal Aviation Administration, the Commission and the airport authority started a project to remove the top of the high hill.[3] The project (called the "Runway 5 Approach Ground Obstruction Removal Project") required the removal of some 1.1 million cubic yards of rock and dirt from the high hill and its placement at an alternative location.[4]

This is a condemnation action by the Commission to take a 10-acre tract of land near Coal Branch Heights called the "Nutter Farm." The Commission determined that the Nutter Farm was the best site to deposit the material removed from the high hill.

William McClellan Nutter originally owned the farm, but he died in 2009. Ownership of the Nutter Farm was inherited by his three adult children: the petitioner, Loretta Lynn Gomez, and his two sons, William Watson Nutter and Charles Curtis Nutter. Each child inherited an undivided one-third interest.

for the purpose of acquiring, establishing, constructing, equipping, improving, financing, maintaining and operating a regional airport or airports, as the case may be, for the use of aircraft . . . [T]he term 'authority' means a regional airport authority[.]").

[3] By removing the hilltop, planes taking off from Yeager Airport would not have to climb as steeply thereby allowing for more passengers, luggage and fuel, as well as reducing the possibility of a controlled flight into terrain.

[4] The Commission worked with the Central West Virginia Regional Airport Authority on the project to acquire over 200 properties through purchase and another 12 through condemnation.

The land surrounding the Nutter Farm had previously been developed into a business park called "Northgate." After Mr. Nutter's death, the developer of Northgate[5] offered to purchase the farm from the three children. On November 13, 2012, the two Nutter sons signed an option agreement to sell their one-third interests to the Northgate developer; the developer later consummated the sale and paid $58,333.33 to each son. Gomez, however, refused to sell her one-third share.

The Commission later purchased the sons' two-thirds interest in the Nutter Farm from the Northgate developer, paying the developer the same amount it paid: $58,333.33 for each one-third interest. On June 14, 2013, the Commission filed a condemnation petition against Gomez, seeking to acquire a fee simple interest in her remaining one-third undivided interest in all 10 acres of the Nutter Farm. The Commission stated that it sought to permanently take the land "for the purpose of improving, maintaining, and operating Yeager Airport." Gomez objected to the petition, claiming the Commission's stated reasons did not constitute a proper "public use" for taking her land.

The circuit court determined that the Commission's stated purposes for taking the property were a proper public use, and then appointed condemnation commissioners[6] to determine the value of her one-third undivided interest in the Nutter

---

[5] The record indicates that the developer of Northgate is John Wellford, as well as his companies, Corotoman, Inc., and H&L, LLC.

[6] *See* W.Va. Code §§ 54-2-5 to -11.

3

Farm. On October 15, 2013, after visiting the property and hearing testimony by the Commission's appraiser, the condemnation commissioners valued Gomez's one-third share of the land at $33,335. The circuit court thereafter permitted the Commission to pay $33,335 into court, and in an order dated December 12, 2013, granted the Commission immediate possession of the Nutter Farm. The date of the entry of this order is the "date of taking" by the Commission.[7]

Counsel for Gomez timely objected to the condemnation commissioners' valuation and demanded a jury trial. The circuit court established a schedule requiring eight months of discovery to be completed by December 1, 2014, and set a date for trial in February 2015.

Following the completion of discovery, the Commission made a motion for summary judgment. The Commission asserted that, while Gomez had retained an appraiser, the appraiser had failed to offer any opinion about the fair market value of the

---

[7] "Compensation for land acquired in a condemnation proceeding should be ascertained and determined on the basis of its value at the time it is taken." Syllabus Point 3, *State Rd. Comm'n v. Ferguson*, 148 W.Va. 742, 137 S.E.2d 206 (1964). In most instances, "the date of the actual taking of the land is the date when, after the report of the commissioners, . . . or after verdict, if a jury is demanded, the money is actually paid to the owner, or into court. Until then the applicant is not permitted to put a foot on the ground." *Buckhannon & N.R. Co. v. Great Scott Coal & Coke Co.*, 75 W. Va. 423, 83 S.E. 1031, 1034 (1914). *But see* W.Va. Code § 54-2-14a [1981] (creating alternate means of condemnation and requiring payment of estimated compensation contemporaneous with filing of condemnation petition); Syllabus Point 1, *W.Va. Dep't of Highways v. Roda*, 177 W.Va. 383, 352 S.E.2d 134 (1986) ("In eminent domain proceedings, the date of take for the purpose of determining the fair market value of property for the fixing of compensation to be made to the condemnee is the date on which the property is lawfully taken by the commencement of appropriate legal proceedings pursuant to *W.Va. Code*, 54-2-14a, as amended.").

4

Nutter Farm. The Commission asked the circuit court to strike the appraiser's testimony. The Commission also asked the circuit court to strike Gomez's "claims," because she had failed to attend her deposition. The Commission conceded in oral argument to the circuit court that Gomez could testify to the value of her interest in the property, but asked the circuit court to take judicial notice of the condemnation commissioners' fair market valuation of $33,335.

In an order dated January 9, 2015, the circuit court struck the testimony of Gomez's expert and struck Gomez's claims. In a later order, dated March 12, 2015, the circuit court granted the Commission's motion for summary judgment and took judicial notice of the condemnation commissioners' valuation of the property. The circuit court found that evidence "could have [been] submitted at trial as to the value of the take" through "the testimony of Gomez." Still, the circuit court noted that counsel for Gomez agreed that summary judgment was preferable to a trial, because "trying the case was nothing more than preserving the record" so that Gomez could challenge the circuit court's pretrial rulings on appeal.

Gomez now appeals the circuit court's summary judgment order. In so doing, she also challenges five pretrial rulings of the circuit court that we discuss below.[8]

---

[8] "[I]f an appeal is taken from what is indeed the last order disposing of the last of all claims as to the last of all parties, then the appeal brings with it all prior orders." *Riffe v. Armstrong*, 197 W.Va. 626, 637, 477 S.E.2d 535, 546 (1996), modified on other grounds by *Moats v. Preston Cty. Comm'n*, 206 W.Va. 8, 521 S.E.2d 180 (1999).

## II.
## STANDARD OF REVIEW

We review a circuit court's entry of summary judgment *de novo*.[9] A circuit court should grant summary judgment "only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."[10]

> Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.[11]

Several of the issues raised by Gomez in her appeal challenge the circuit court's interpretation of the law of condemnation. Questions of law are subject to a *de novo* review by this Court.[12]

---

[9] Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

[10] Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

[11] Syllabus Point 4, *Painter v. Peavy*, 192 W.Va. at 190, 451 S.E.2d at 756.

[12] *See, e.g.*, Syllabus Point 4, in part, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996) ("[C]onclusions of law are reviewed *de novo*."); Syllabus Point 2, in part, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997) ("Questions of law are subject to *de novo* review."); Syllabus Point 3, in part, *State v. Vance,* 207 W.Va. 640, 535 S.E.2d 484 (2000) ("Questions of law are subject to a de novo review.").

# III.
# ANALYSIS

Petitioner Gomez asserts that the circuit court erred in five different pretrial rulings, rulings that then culminated in a summary judgment ruling in favor of the respondent Commission. Gomez asserts the circuit court erred: (1) in finding, as a matter of law, that the Commission took the Nutter Farm for a public use, and in refusing to submit the question of public use to a jury; (2) in preventing her from arguing that the highest and best use of the Nutter Farm (and thereby, its highest fair market value) was by the Commission as a dump site for dirt; (3) in excluding her expert; (4) in striking her claims when she failed to appear at her deposition; and (5) in taking judicial notice of the condemnation commissioners' valuation of her land. We examine these five pretrial rulings in that order before addressing the circuit court's summary judgment order.

## A.
### *Public Use is a Question of Law*

Gomez argues that the circuit court erred when it found that the Commission took the Nutter Farm for a "public use." Gomez's counsel cites us to no law supporting her argument, but she contends the question is one of fact for a jury.

Gomez's argument is basically this: the Commission stated in its condemnation petition that it sought to permanently take the Nutter Farm "for the purpose of improving, maintaining, and operating Yeager Airport." Gomez, however,

7

sought to dismiss the petition and argued below that the Commission's taking of the land was not a proper public use, largely because the land was not connected to or being used as an airport. Further, she asserted the Commission only temporarily used the land as a site to dump dirt and rock; once construction was completed, the land would no longer be used by the Commission (even though covered by 1.1 million cubic yards of material). Overall, Mrs. Gomez argued that a jury should be allowed to decide whether the taking of the Nutter Farm was for a legitimate public purpose.

In several orders, the circuit court refused to dismiss the Commission's condemnation petition.[13] The circuit court made two rulings that Gomez challenges. First, the circuit court concluded, as a matter of law, that the Commission's reason for taking the Nutter Farm was an appropriate public use. Second, the circuit court refused to allow Mrs. Gomez to make her argument to a jury. We find no error in the circuit court's decisions.

Eminent domain is the power of the State to take or damage private property for a public purpose upon payment of just compensation. The right of the State to take private property for public purposes "is an inherent attribute of sovereignty,

---

[13] *See*, orders by the circuit court dated August 15, 2013 ("It appearing to the Court that this case is one in which the Petitioner has the lawful right to take private property for the public purpose stated in the petition, the same being for public purposes."); December 12, 2013 ("The Kanawha County Commission had the lawful right to take the subject private property for the public purposes as stated in the petition[.]"); or March 12, 2014 ("KCC had the lawful right to take the subject property for the public purposes as stated in the petition[.]"]

8

irrespective of any constitutional or statutory provision."[14]  The right of eminent domain

may be delegated and vested by the Legislature in the various subdivisions of the State,

such as counties and regional airport authorities.[15]

The West Virginia Constitution is not the source of the State's power of

eminent domain; instead, it is a restriction upon its exercise.  Article III, section 9 of the

Constitution provides "that private property shall not be taken or damaged for public use

without just compensation and that, when required by either of the parties, the

compensation shall be ascertained by a jury of twelve freeholders."[16]  In light of this

---

[14] *State by State Rd. Comm'n v. Prof'l Realty Co.*, 144 W.Va. 652, 657, 110 S.E.2d 616, 620 (1959).

[15] *State v. Horner*, 121 W.Va. 75, 81, 1 S.E.2d 486, 486 (1939) ("The right of eminent domain, being an attribute of sovereignty, may be vested, by legislative action, in various subdivisions of state, as well as in private ventures where they are to be devoted to uses in which public has right to share.").  *See also*, W.Va. Code § 8-29-12 [1969] (granting power of eminent domain to airport authorities); W.Va. Code § 54-1-1 [1931] (granting power of eminent domain to every "corporate body politic heretofore or hereafter created by the Constitution or statutes of the State," such as counties).

[16] *State by State Rd. Comm'n v. Prof'l Realty Co.*, 144 W.Va. at 657-58, 110 S.E.2d at 620.  Article III, section 9 of the Constitution provides:

> Private property shall not be taken or damaged for public use, without just compensation; nor shall the same be taken by any company, incorporated for the purposes of internal improvement, until just compensation shall have been paid, or secured to be paid, to the owner; and when private property shall be taken, or damaged for public use, or for the use of such corporation, the compensation to the owner shall be ascertained in such manner as may be prescribed by general law:  Provided, That when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders.

constitutional provision, the Legislature has established by law a judicial procedure for

determining just compensation.[17] The process is called "condemnation."[18]

Private property can constitutionally be taken by eminent domain only for a

"public" use.[19] Further, it may only be taken in exchange for payment of "just"

compensation.[20] "In the exercise of its power of eminent domain the State, through its

legislature, . . . may take . . . for public purposes, any estate in land dictated by its

sovereign will."[21]

In a condemnation proceeding, the circuit court is charged with determining

whether the applicant has a lawful right to take property for the purposes stated in the

---

[17] *See* W.Va. Code §§ 54-2-1 to -21.

[18] "'Eminent domain' is the legal term for the inherent power of a government entity to take private property for public use. 'Condemnation' is the legal proceeding filed by a government entity in the exercise of its eminent domain power to take private property for public use." *W.Va. Dep't of Transp., Div. of Highways v. Western Pocahontas Properties, L.P.*, 236 W.Va. 50, 58 n.1, 777 S.E.2d 619, 627 n.1 (2015), cert. denied sub nom. *Beacon Res., Inc. v. W.Va. Dep't of Transp., Div. of Highways*, 136 S.Ct. 1453 (2016) (citations omitted).

[19] *W.Va. Transportation Co. v. Volcanic Oil & Coal Co.*, 5 W.Va. 382, 388 (1872) ("Private property can only be taken for public uses[.]"); Syllabus Points 1 and 2, in part, *Varner v. Martin*, 21 W.Va. 534 (1883) ("Under our Constitution private property can not be taken with or without compensation for *private* use. . . . [P]rivate property can be taken only for *public* use[.]").

[20] *Hays v. Walnut Creek Oil Co.*, 75 W.Va. 263, 266, 83 S.E. 900, 901-02 (1914) ("[P]rivate property shall not be taken or damaged for public use without just compensation[.]")

[21] Syllabus Point 1, in part, *Hays v. Walnut Creek Oil Co.*, 75 W.Va. at 263, 83 S.E. at 900.

condemnation petition.[22] The circuit court determines, as a matter of law, whether a property may lawfully be taken. The property may lawfully be taken if the applicant's expressed use of the property is, in fact, a public one,[23] and the condemnation is not impelled by bad faith or arbitrary and capricious motives.[24] To qualify as a lawful public use is simple: "The public must have some direct and certain right, or interest in it, or control over it."[25] "In the absence of egregious bad faith, if the use is a public one, the

---

[22] W.Va. Code § 54-2-5 [1963]. *See also*, W.Va. Code § 54-2-14 [1981] ("[i]f the applicant be the State of West Virginia, or any political subdivision thereof" that uses the condemnation process under this section, the circuit court must be "satisfied that the purpose for which the land or property is sought to be condemned is a public use for which private property may be appropriated on compensating the owner[.]") and W.Va. Code § 54-2-14a (similar).

[23] *Potomac Valley Soil Conservation Dist. v. Wilkins*, 188 W.Va. 275, 279, 423 S.E.2d 884, 888 (1992) ("a court's inquiry into the scope of such power is limited solely to the question of whether it is to be exercised in order to provide a public service.").

[24] "[T]he power of the state or its subdivisions should not be arbitrarily or capriciously invoked." *State v. Horner*, 121 W.Va. at 81, 1 S.E.2d at 489. *See also State by State Rd. Comm'n v. Prof'l Realty Co.*, 144 W.Va. at 658, 110 S.E.2d at 620-21 (Agency's exercise of eminent domain "will not be interfered with by the courts, unless the agency exercising the right 'has acted capriciously, fraudulently, or in bad faith.'"); Syllabus Point 1, *George v. City of Wellsburg*, 111 W.Va. 679, 163 S.E. 431 (1932) ("The necessity for improvement of a street is within the sound discretion of the municipal authorities, and their decision that a necessity exists will not be interfered with by the courts, unless they have acted capriciously, fraudulently, or in bad faith."); Syllabus Point 3, *City of Huntington v. Frederick Holding Co.*, 85 W.Va. 241, 101 S.E. 461 (1919) ("The necessity for widening a city street is a matter committed to the local authorities of the municipality, and the decision of this question by such authorities will not be interfered with by the courts, unless it is made to appear that they acted capriciously, fraudulently, or in bad faith.").

[25] *Pittsburg Hydro-Elec. Co. v. Liston*, 70 W.Va. 83, 88, 73 S.E. 86, 90 (1911).

11

necessity for the designated property is not open to judicial review."[26]  Stated differently,

"[w]hether it is expedient, appropriate or necessary to provide for a public service of a

particular kind or character, is a legislative, not a judicial, question."[27]

> When the court has determined that the use for which property is condemned is a public use, its judicial function is gone and the legislative discretion is unrestrained.  Whether the proposed plan will accomplish the end proposed, or to what extent it will be beneficial to the public, are not matters to be determined by the courts; these are matters belonging to the legislative discretion.[28]

---

[26] *United States v. 49.79 Acres of Land, More or Less, Situate in New Castle Cty., State of Del.*, 582 F. Supp. 368, 372 (D. Del. 1983).

[27] Syllabus Point 2, *Pittsburg Hydro-Elec. Co. v. Liston*, 70 W.Va. at 83, 73 S.E. at 86.  *See also*, Syllabus Point 6, in part, *Baltimore & Ohio Railroad Co. v. Pittsburg, Wheeling & Kentucky Railroad Co.*, 17 W.Va. 812 (1881) ("When the use for which private property is appropriated is public . . . the expediency or necessity of appropriating any particular property is not a subject of judicial cognizance.").  Likewise, the quantity of land to be taken for a public project is a question within the sole discretion of the government agency exercising the power of eminent domain; courts will not interfere with that discretion unless it is abused.  Syllabus Point 2, *State by State Road Comm'n v. Bouchelle*, 137 W.Va. 572, 73 S.E.2d 432 (1952).  Accord, Syllabus Point 1, *Mr. Klean Car Wash, Inc. v. Ritchie*, 161 W.Va. 615, 244 S.E.2d 553 (1978); Syllabus Point 4, *Potomac Valley Soil Conservation Dist. v. Wilkins*, 188 W.Va. 275, 423 S.E.2d 844 (1992).  *See also* Syllabus Point 7, *W.Va. & Maryland Power Co. v. Racoon Valley Coal Co.*, 93 W.Va. 505, 117 S.E. 891 (1923) ("And likewise, the width of the right of way . . . is left largely to the discretion of the condemnor."); *Monongahela Power Co. v. Shackelford*, 137 W.Va. 441, 452, 73 S.E.2d 809, 815-16 (1952) ("[W]hen an applicant shows . . . that the land it proposes to take for public use is necessary, the quantity of the land to be taken by the applicant is generally a matter within its discretion; that such discretion, if exercised within legal limitations, is practically absolute; and that the courts will not control the right to take any particular land unless such right of the applicant is clearly abused.")

[28] *Charleston Nat. Gas Co. v. Lowe & Butler, Trustees*, 52 W.Va. 662, 664, 44 S.E. 410, 411 (1901).  *See also Berman v. Parker*, 348 U.S. 26, 35-36, 75 S. Ct. 98, 104 (1954) ("Once the question of the public purpose has been decided, the amount and

(continued . . .)

12

Gomez does not suggest, let alone make an affirmative showing, that the Commission's decision to use its eminent domain power was impelled by bad faith or arbitrary and capricious motives. Her arguments center solely upon whether the Commission's stated use for the Nutter Farm in its petition is, in fact, a public one.

The Commission's condemnation petition expressed that it sought to take the Nutter Farm "for the purpose of improving, maintaining, and operating Yeager Airport." The Commission determined that removal of the high hill southwest of the public airport would improve navigation of planes onto and off of the runway, and determined that the Nutter Farm was the best location for depositing the material removed. The taking of the Nutter Farm for these purposes has a direct and certain effect on the public: the improvement, maintenance, and operation of a publicly-owned airport. On this evidence, the circuit court was correct to find the property was condemned for a public use.

Gomez further asserts, however, that the issue of whether the property was taken for a public use is a factual question that should be submitted to a jury. We reject this argument. "The question of what is a public use is always one of law."[29] It is well established that the question of whether property has been taken for a public use in a condemnation proceeding is a question of law for the court, and not a question of fact for

character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.").

[29] Syllabus Point 1, in part, *Hench v. Pritt*, 62 W.Va. 270, 57 S.E. 808 (1907).

13

a jury.[30]  The circuit court was correct to deny Gomez a jury trial on the question of whether the land was taken for a public use.

## B.
### The Project Influence Rule

Gomez's second argument – and the centerpiece of her entire case – concerns the methods for calculating the just compensation that the Commission should pay for her one-third interest in the Nutter Farm.  Gomez asserts that any proper valuation of her interest should include the Commission's use of the land as a dump site for 1.1 million cubic yards of material.  Gomez noted that the Commission had agreed to pay a neighboring landowner, the Northgate developer, a $3.50 per cubic yard "wheelage fee" for permission to transport the removed hill material across Northgate property.  She argued that the fair market value of the Nutter Farm should incorporate a similar per-cubic-yard dumping fee.

---

[30] *See* Syllabus, *Shelton v. State Rd. Comm'n*, 113 W.Va. 191, 167 S.E. 444, 444 (1932) ("While it is ordinarily within the discretion of the agency exercising the power of eminent domain to determine the quantity of land necessary for a public use, what is such public use as will justify the exercise of the power in the particular case is usually a judicial question depending upon the facts."); *Carnegie Nat. Gas Co. v. Swiger*, 72 W.Va. 557, 573, 79 S.E. 3, 10 (1913) ("Lastly, it is urged that it was error to deny the defendant the right of trial by jury, on the question of the public need or benefit of the proposed pipe line.  This the authorities hold is a judicial question, and not one of fact to be tried by a jury."); *Pittsburg Hydro-Elec. Co. v. Liston*, 70 W.Va. at 87, 73 S.E. at 88 ("The only question which the courts are authorized to determine is, whether or not the use intended is, in effect, a public use.  This is conceded to be a judicial question."); Syllabus Point 1, *Pittsburg, Wheeling & Kentucky Railroad Co. v. Benwood Iron Works*, 31 W.Va. 710, 8 S.E. 453 (1888) ("Whether the use, to which property sought to be taken under the exercise of eminent domain is public or private, is a judicial question subject to review by the appellate court.").

Before the circuit court, the Commission filed a motion in limine to preclude Gomez from offering any valuation of the land that incorporated the Commission's intent to use it as a dump site. In an order dated November 25, 2014, the circuit court granted the motion in limine and ruled that Mrs. Gomez would "not be permitted to introduce evidence of an increased value of the property as it relates to the purpose of the condemnation, i.e. the runway project." The circuit court concluded that the fair market value of condemned real estate is based upon the price that would be paid in the open market between a willing buyer and a willing seller, as of the date of the taking, without any consideration of the impact the proposed government project would have on the property.

Gomez asserts that the circuit court's ruling was wrong. However, we reject her assertion and affirm the circuit court's pretrial ruling.

"The measure of just compensation to be awarded to one whose interest in real estate is taken for a public use in a condemnation proceeding is the fair market value of the property at the time of the taking."[31] "The fair market value is the price that the

---

[31] Syllabus Point 1, *Western Pocahontas Properties*, 236 W.Va. at 27, 777 S.E.2d at 626. To be clear, the only absolute compensation standard is that it must be "just." In unique circumstances, an alternative method of valuation may be considered:

> Market value is simply a practical standard adopted to provide the owner with his constitutionally guaranteed indemnity; it is not an end in itself. Moreover, it seems clear that the Constitution may require alternative means of indemnity where the market value standard proves inadequate. The United States Supreme Court has thus stated that it "has refused to make a fetish . . . of market value, since

(continued . . .)

15

property would bring if it were offered for sale on the open market by someone who

wanted to sell and was bought by someone who wanted to buy, both exercising prudence

and intelligent judgment as to its value, and neither being under any compulsion to buy or

sell."[32]

In a recent eminent domain case, *West Virginia Department of Transportation v. Western Pocahontas Properties*,[33] we discussed the elements that enter

into a determination of a property's fair market value:

> The challenge in assessing just compensation in a condemnation case is this: what uses and factors would be considered in setting the market price by a willing buyer and a willing seller, each acting with complete freedom and knowledge of the property? "[E]very element of value which would be taken into consideration between private parties in a sale of property should be considered in arriving at a just compensation for the land proposed to be taken[.]"

---

> it may not be the best measure of value in some cases." It must be remembered that the purpose of any condemnation value rule is simply to put the owner "in as good (a) position pecuniarily as he would have occupied if his property had not been taken."

*City of Tulsa v. Mingo Sch. Dist. No. 16.*, 559 P.2d 487, 494 (Okla. 1976) (citations omitted).

[32] Menis E. Ketchum, *West Virginia Pattern Jury Instructions for Civil Cases*, § 1204 (2016). *See also* Syllabus Point 5, *Wheeling Electric Co. v. Gist*, 154 W.Va. 69, 173 S.E.2d 336 (1970) ("The market value in such case is the price for which the land could be sold in the market by a person desirous of selling to a person wishing to buy, both freely exercising prudence and intelligent judgment as to its value, and unaffected by compulsion of any kind."); *Western Pocahontas Properties*, 236 W.Va. at 62 n.18, 777 S.E.2d at 631 n.18 (reciting other, similar definitions of fair market value).

[33] 236 W.Va. 50, 777 S.E.2d 619 (2015).

Conversely, "[c]onsiderations that may not reasonably be held to affect market value are excluded." Essentially, any factor that a reasonable buyer or seller would typically consider should be included in an analysis of fair market value.

Thus, for the purpose of determining the market value of property taken by eminent domain,

consideration should be given to every element of value which ordinarily arises in negotiations between private persons with respect to the voluntary sale and purchase of land, the use made of the land at the time . . . it is taken, its suitability for other uses, its adaptability for every useful purpose to which it may be reasonably expected to be immediately devoted, and the most advantageous uses to which it may so be applied.

Finally, whatever uses and factors are considered, "the date of take for the purpose of determining the fair market value for the fixing of compensation to be made to the condemnee is the date on which the property is lawfully taken by the commencement of appropriate legal proceedings [.]"[34]

An important consideration in estimating fair market value is determining the "highest and best use" of the property.[35] In determining a fair value, the landowner

---

[34] *Id.*, 236 W.Va. at 62-63, 777 S.E.2d at 631-32 (footnotes omitted).

[35] *W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. 726, 733, 280 S.E.2d 609, 614 (1981). *See also Wood v. Wyoming Cty. Court*, 100 W.Va. 29, 129 S.E. 747, 747 (1925) ("The land owner in this case is entitled to compensation for the land taken based on the most valuable use to which the property is adapted."); Syllabus Point 9, *Baltimore & O.R. Co. v. Bonafield's Heirs*, 79 W.Va. 287, 90 S.E. 868 (1916) ("In proving its value the land-owners are not limited to the use which they are then actually making of the land taken, but are entitled to have the jury consider its value for any purpose for which it is then reasonably available."); Syllabus Point 3, *Norfolk & W. Ry. Co. v. Davis*, 58 W.Va. 620, 52 S.E. 724 (1906) ("As to the value of the property taken, (continued . . .)

17

"is not limited to the use actually being made of the land at the time of the taking but is entitled to consideration of its value for any purpose for which it is then reasonably available in the immediate future."[36]

Gomez argues that, on the day that the Commission took her land, the "highest and best" use of the land was as a dump site by the Commission for the rock and dirt carved off a nearby hilltop. Gomez asserts that she should be permitted to introduce evidence that the Commission's runway obstruction removal project enhanced the value of her land.

We reject Gomez's argument because it runs afoul of the long-standing "project influence rule." This rule was developed in recognition that, when the government (or other condemnor) announces it will construct a public improvement, the value of the land in the vicinity of the proposed improvement often rises or decreases before the actual taking. "An impending condemnation . . . can distort the market by inflating or depressing land values."[37] The change in valuation directly caused by the project is often called "condemnation blight" or "project enhancement":

---

the proper inquiry is, what is the value of the property for the most advantageous uses to which it may be applied?").

[36] *Berwind Land Co.*, 167 W.Va. at 733, 280 S.E.2d at 614. *See also*, Menis E. Ketchum, *West Virginia Pattern Jury Instructions for Civil Cases*, § 1204 (2016).

[37] *Baston v. City of Kenton ex rel. Kenton Cty. Airport Bd.*, 319 S.W.2d 401, 408 (Ky. 2010).

18

*Condemnation blight* is a diminution in the market value of a property due to pending condemnation action; *project enhancement* is an increase in a property's market value in anticipation of a public project requiring condemnation action.[38]

The project influence rule basically holds that any enhancement or depreciation in value caused by a public project for which the land is condemned and taken must be disregarded in determining the market value of the land. "[M]arket value should be determined as if the condemnation did not exist."[39] The rule is supported by "the great weight of authority,"[40] and there are two general motives behind the rule:

> The dual purpose of this rule is first to safeguard the government from paying a premium price for land that would not have been valued so high but for the planned government project's enhancement of land value in the area. Second, even more crucial to individual property rights, the rule exists to protect citizens who own private property from being penalized by receiving depreciated compensation for their land that would not have been so low but for the fact that the project will cause land prices in the area to fall.[41]

---

[38] J.D. Eaton, *Real Estate Valuation in Litigation*, 118 (2d ed. 1995).

[39] *Baston*, 319 S.W.3d at 408.

[40] P.H. Vartanian, "Increment to value, from project for which land is condemned, as a factor in fixing compensation," 147 A.L.R. 66, 68 (1943). *See also* L.R. James, "Depreciation in value, from project for which land is condemned, as a factor in fixing compensation," 5 A.L.R.3d 901 (1966).

[41] *State ex rel. Missouri Highways & Transp. Comm'n v. 1811 N. Broadway, LLC*, 405 S.W.3d 539, 545-46 (Mo. Ct. App. 2013). *See also*, *City of Boulder v. Fowler Irrevocable Trust 1992-1*, 53 P.3d 725, 728 (Colo. App. 2002) ("This principle promotes fairness in valuing property by preventing a windfall to the property owner based on speculative potential enhancements in value while, at the same time, protecting

(continued . . .)

This Court recognized the project influence rule as early as 1874 when it found that an *increase* in land value resulting from a proposed public project could not be considered in awarding just compensation. In *Chesapeake & Ohio Railroad Company v. Tyree*, we said that a landowner in a condemnation action is constitutionally entitled to "the actual value of the land taken, at the time when taken."[42] When a public project is announced (in *Tyree*, the project was a railroad), the value of the land may increase even though the project "may never be completed. Its construction for various reasons may fail to have its supposed effect."[43] The Court concluded that any enhanced value to the land by reason of the public project "would be speculative in its character."[44] Hence, just compensation is "the actual value of the land when taken without reference to enhanced value, given to it . . . by reason of the prospective construction" of the public project.[45] Under this rule, "the land owner receives a just compensation for his land, which is taken, and not an excessive or unjust compensation."[46]

This Court considered the project influence rule in the context of a *decrease* in property values (that is, condemnation blight) in 1978. In *Huntington Urban Renewal*

the property owner from the injustice of assessing against it a diminution in the property's value caused by the same project for which it is being taken.").

[42] *Chesapeake & Ohio R. Co. v. Tyree*, 7 W.Va. 693, 698 (1874).

[43] *Id.*

[44] *Id.*

[45] *Id.* at 699.

[46] *Id.*

20

*Authority v. Commercial Adjunct Company*, the government sought to take a tract of land being used for a parking lot as part of a large urban renewal project.[47] The owner of the parking lot asserted that his parking revenues, and the value of his land, had diminished over several prior years because the government had condemned several nearby business properties. Some of those properties has been converted into government-owned parking garages that competed with the parking lot's business. The question on appeal was whether the jury should have been instructed to "disregard any decline in the value of Commercial Adjunct's parking lot for which the jury could hold the Urban Renewal Authority solely and directly responsible."[48]

This Court ruled that the jury should have been instructed to disregard any depreciation to the parking lot's value caused by the urban renewal project. The Court stated in the Syllabus:

> Any decrease, not of a general character, in the fair market value of real property prior to the date of valuation, caused by the public improvement for which such property is acquired, or by the likelihood that the property will be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, should be disregarded in any determination of the just compensation to be awarded the property owner for the property.[49]

---

[47] *Huntington Urban Renewal Auth. v. Commercial Adjunct Co.*, 161 W.Va. 360-361, 242 S.E.2d 562, 563 (1978).

[48] *Id.*, 161 W.Va. at 362, 242 S.E.2d at 564.

[49] *Id.*, Syllabus, 161 W.Va. at 360, 242 S.E.2d at 563.

As we previously noted, only elements of value that a reasonable buyer or seller would typically consider should be included in an analysis of fair market value. The emphasis is on a *reasonable* buyer and seller, not on a unique buyer or seller.

> Fair market value is to be determined in terms of what the property would be worth to a knowledgeable but disinterested buyer *in the general market*—a generic buyer as opposed to a specific one—as if there were no condemnation action. Put another way, "'just compensation' contemplates compensation measured by what the landowner has lost rather than by what the condemner has gained."[50]

"Valuation should try to exclude values which appear when the market is distorted[.]"[51] Hence, in a condemnation case, courts should exclude from the calculation of fair market value consideration for "an owner who may not want to part with his land because of its special adaptability to his own use, and a taker who needs the land because of its peculiar fitness for the taker's purposes."[52]

Moreover, while the landowner is entitled to a fair market value based upon the land's highest and best use, "its special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an

---

[50] *Sierra View Local Health Care Dist. v. Sierra View Med. Plaza Associates, LP*, 24 Cal. Rptr. 3d 210, 216 (2005) (quoting *Merced Irrigation Dist. v. Woolstenhulme*, 483 P.2d 1, 11 (Cal. 1971)).

[51] *City of Valdez v. 18.99 Acres, More or Less, of Land Situated in City of Valdez*, 686 P.2d 682, 689 (Alaska 1984). Conversely, "when the market is functioning normally, the evidence it presents should be considered." *Id.*

[52] *United States v. Miller*, 317 U.S. 369, 375, 63 S.Ct. 276, 280 (1943).

22

element of market value."[53] "Highest and best use cannot be predicated on a demand created solely by the project for which the property is acquired[.]"[54] "To compensate a landowner for value attributable to the condemnation project itself . . . would place the landowner in a better position than he would have enjoyed had there been no condemnation."[55]

> [M]arket value ordinarily means the price the property would bring if sold in the open market under ordinary and usual circumstances, for cash, assuming that the owner is willing to sell and the purchaser willing to buy, but neither under any obligation to do so. Under this test it is obvious that just compensation cannot include any increment arising from the very fact of acquisition [by condemnation] of the subject property. If the land were sold in the open market under ordinary and usual circumstances, factors relating to public acquisition would have to be excluded from consideration. In such a case there would be no condemnation at issue.[56]

Stated another way, "government projects may render property valuable for a unique purpose. Value for such a purpose, if considered, would cause the market to be an unfair indication of value, because there is no market apart from the government's demand."[57]

---

[53] *Id.* at 375, 63 S.Ct. at 280-81.

[54] Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions*, 35 (2000).

[55] *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 632, 628 (Tex. 2002).

[56] *Williams v. City & Cty. of Denver*, 363 P.2d 171, 174 (Colo. 1961).

[57] *United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1367 (9th Cir. 1976) (quotation and citation omitted)

The underlying notion of the "no value attributable to Government demand" principle, then, is that the Government, when pursuing public benefits through its condemnation power, should not have to spend more for property than would a reasonable and willing private purchaser *solely* because it is exercising its condemnation power on behalf of the public; instead, the Government is to be equated to a private purchaser buying the property for its "highest and best" nongovernmental use in an open market.[58]

In federal projects, Congress has codified the project influence rule under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.[59]

The Act provides:

> Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property.[60]

The United States Supreme Court has similarly stated:

> It is not fair that the government be required to pay the enhanced price which its demand alone has created. That enhancement reflects elements of the value that was created by the urgency of its need for the article. It does not reflect what 'a willing buyer would pay in cash to a willing seller,' in a fair market. . . . [T]he enhanced value reflects speculation as to what the government can be compelled to pay. That is a

---

[58] *United States v. 320.0 Acres of Land, More or Less*, 605 F.2d 762, 782-83 (5th Cir. 1979).

[59] *See* 42 U.S.C. §§ 4601 to 4655.

[60] 42 U.S.C. § 4651(3) [1987].

hold-up value, not a fair market value. That is a value which the government itself created and hence in fairness should not be required to pay.[61]

We emphasize that the project influence rule is implicated in condemnation actions *for property that is taken*. When only a portion of the property is taken, leaving the landowner in possession of a "residue," then any increase or decrease in the fair market value of the residue caused by the public improvement may be considered by the jury.[62] The residue may be valued by its highest and best use that accounts for the public improvement.[63]

We hold that, under the project influence rule any increase or decrease in value to the condemned land directly attributable to the project for which the land is

---

[61] *United States v. Cors*, 337 U.S. 325, 333-34, 69 S.Ct. 1086, 1091 (1949) (citation omitted).

[62] *See Western Pocahontas Properties*, 236 W.Va. at 62, 777 S.E.2d at 631 ("The difference in the fair market value of the residue immediately before and immediately after the taking is the proper measure of just compensation."); Syllabus Point 3, *W.Va. Virginia Dep't of Highways v. Bartlett*, 156 W.Va. 431, 432, 194 S.E.2d 383, 384 (1973) ("The approved and general rule for the measure of damages in an eminent domain proceeding where parts of the land are taken is the fair market value for the land at the time it was taken, plus the difference in the fair market value of the residue immediately before and immediately after the taking less all benefits which may accrue to the residue from the construction of the improvement for which the land was taken."). *See also* Ketchum, "Damage to Residue," § 1205 ("The measure of damages to the landowner's remaining property is the difference between the fair market value of the property immediately before the taking and its fair market value immediately after the taking.").

[63] *Uniform Appraisal Standards for Federal Land Acquisitions* at 36 ("The value of the remainder, after a partial acquisition, is governed largely by its highest and best use.").

taken must be disregarded in determining the market value of the land.[64] There are, of course, exceptional situations where evidence of enhancement or depreciation resulting from the taking are admissible, such as when the condemnor's proposed use of the land taken is consistent with the highest and best use of the property in the private marketplace.[65] No such exceptional situation exists in this case.

---

[64] *See, e.g.*, *St. Louis Elec. Terminal Ry. Co. v. MacAdaras*, 166 S.W. 307, 310 (Mo. 1914) (the project influence doctrine holds that the jury may not consider "either enhancements or depreciation brought about by the construction of the improvement for which the property is being taken. In other words, the value should be determined independent of the proposed improvement."); *Hembree v. United States*, 347 F.2d 109, 111 (8th Cir. 1965) ("The enhanced value created by the condemnor's need for and use of the property is not to be considered in determining the fair market value of the property that has been taken."); *Bd. of Cty. Comm'rs of Eagle Cty. v. Vail Associates, Ltd.*, 468 P.2d 842, 847 (Colo. 1970) ("A landowner is not entitled to recover an increase or enhancement in value of his land caused by the proposed improvement for which his land is being taken. Nor should a landowner be entitled to indirectly increase the value of his land being taken by comparing it with a sale of other land the value of which has been enhanced by the public improvement contemplated."); *Masheter v. Kebe*, 295 N.E.2d 429, 431 (Ohio Ct. App. 1973) ("[P]roperty taken by condemnation proceedings should be valued irrespective of the effects of the improvement upon it . . . The property owner is not entitled to an increased value to the land resulting from the improvement, nor should he be made to suffer for any diminution in value to the land taken resulting from the improvement."); *Chicago & N. W. Transp. Co. v. United Sta*tes, 678 F.2d 665, 669 (7th Cir. 1982) ("Whatever the intended use by the government, the condemnee who asks for more than what the property would have been worth to him if the government had not wanted the property is trying to engross 'hold out' values – the very thing, one might have thought, that the eminent-domain power was intended to excuse the government from having to pay.").

[65] "A proposed highest and best use cannot be the use for which the government is acquiring the property . . . unless there is a prospect and competitive demand for that use by others than the government." *Uniform Appraisal Standards for Federal Land Acquisition* at 47. *See, e.g. City of Los Angeles v. Decker*, 558 P.2d 545, 549 (Cal. 1977) (city sought to expand airport, and planned to use landowner's property as a parking facility; property had previously been zoned for uses including parking lots, and landowner's appraiser was properly permitted to testify to parking as the highest and

(continued . . .)

In the instant case, Gomez asserts that the highest and best use of the Nutter Farm is the same as the use for which the Commission is acquiring the property: as a dump site for 1.1 million cubic yards of dirt removed from the high hill in the Coal Heights neighborhood. She contends the property should not be valued as a hilly, dilapidated, largely unimproved farm, but instead should be valued, first, as a profit-making enterprise accepting rock and dirt on a per-cubic-yard basis, and second as a cleared and flattened property available for commercial development.

However, Gomez's position plainly violates the project influence doctrine. The Commission cannot be required to pay an enhanced price for the property which its demand alone has created. Gomez's proposed method for valuing the land value does not reflect the market; it does not reflect what 'a willing buyer would pay in cash to a willing seller,' in a fair market. Rather, it reflects a value created solely by the Commission's need for the property. Gomez cannot show that the general land marketplace in Kanawha

---

best use of the condemned property); *Sierra View Local Health Care Dist. v. Sierra View Med. Plaza Associates, LP*, 24 Cal. Rptr. 3d at 216 (public hospital condemned a medical office building for use as a medical office building; jury could consider that the historical use of the property by the condemnee was the same as the public hospital's proposed use after condemnation); *City of Gary v. Belovich*, 623 N.E.2d 1084, 1089 (Ind. Ct. App. 1993) (because fire station was built on land before condemnation, jury could consider that highest and best use of land was as a fire station). *See also*, *City & Cty of Denver, By, Through & for Use of Bd. Of Water Comm'rs v. Smith*, 381 P.2d 269, 272 (Colo. 1963) ("There are, of course, exceptional situations where the courts will admit evidence of enhancement resulting from the acquisition. They include cases where the location of the proposed project is indefinite or where there is a supplemental taking."); *Fuller v. State*, 461 S.W.2d 595, 599 (Tex. 1970) (an exception to the project influence rule exists "when the condemnor first takes a limited amount of land, the value of near by property increases, and then the condemnor takes an additional amount of land.").

27

County, separate and apart from the Commission's needs, sought to pay dump fees to use the Nutter Farm as a site for depositing fill. To allow a jury to consider any increase in value attributable to the Commission's condemnation project would place Gomez in a better position than other sellers in the market, and in a better position than she would have enjoyed had there been no condemnation.

Accordingly, we affirm the circuit court's November 25, 2014, in limine ruling prohibiting Gomez from offering any evidence of an increased value to the Nutter Farm caused by the Commission's Runway 5 Ground Obstruction Removal Project.

## C.
### Striking the Landowner's Appraiser

The circuit court's deadline for completing discovery was December 1, 2014. Gomez's third argument is that the circuit court erred when, in an order dated January 9, 2015, it struck her appraisal expert and refused to give her expert additional time to inspect the Nutter Farm and formulate an opinion about the property's value. The circuit court struck the expert for two reasons. First, after eight months of discovery, the expert failed to offer any opinion as to the fair market value of the property at the time of the Commission's taking. The only opinion offered by the expert was a criticism of the methods used by the Commission's expert appraiser.

Second, and more importantly, Gomez had asked the expert to develop an opinion that violated the project influence rule. Gomez asserted to the circuit court that

28

the expert needed additional time to assess the enhanced value of the property, after the date of the taking, caused by the Commission's project.[66]

Rule 16 of the West Virginia Rules of Civil Procedure requires a trial court to establish a scheduling order that, among other things, limits the time for the parties to conduct discovery.[67] If a party fails to obey the scheduling order and fails to timely produce discovery, the trial court is empowered to impose sanctions[68] under West Virginia Rule of Civil Procedure 37(b)(2) [2010] which provides, in relevant part:

> If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others are the following: . . .
>
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence[.]

---

[66] Gomez's counsel stated the expert intended to utilize the income capitalization approach to calculate the property's earning power as a dump site. Gomez's counsel further says the expert could not formulate an opinion about the property's value without knowing how the Commission was using the property subsequent to the taking. The expert needed to know the number of cubic yards of material that the Commission had placed on the property, and its condition after the Commission's public project was completed.

[67] Rule 16(b)(3) [1998] ("[T]he judge shall . . . enter a scheduling order that limits the time: . . . (3) To complete discovery.").

[68] *See* Rule 16(f) ("If a party . . . fails to obey a scheduling or pretrial order . . . the judge . . . may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B)[.]").

When a party fails to disclose expert discovery in a timely fashion, we have stated that a trial court has substantial discretion to formulate a remedy:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.[69]

"The imposition of sanctions by a circuit court under W. Va. R. Civ. P. 37(b) for the failure of a party to obey the court's order to provide or permit discovery is within the sound discretion of the court and will not be disturbed upon appeal unless there has been an abuse of that discretion."[70] Whatever sanction is imposed, "[b]oth Rule 16(f) and 37(b) of the Rules of Civil Procedure allow the imposition of only those sanctions that are 'just.'"[71]

It is undisputed that Gomez's counsel did not disclose an expert opinion on the fair market value of the property taken within the time period set by the court.

---

[69] Syllabus Point 1, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995).

[70] Syllabus Point 1, *Bell v. Inland Mut. Ins. Co.*, 175 W.Va. 165, 332 S.E.2d 127, cert. denied sub nom. *Camden Fire Ins. Ass'n v. Justice*, 474 U.S. 936, 106 S.Ct. 299, 88 L.Ed.2d 277 (1985).

[71] *Bartles v. Hinkle*, 196 W.Va. 381, 390, 472 S.E.2d 827, 836 (1996) (citation omitted).

Moreover, Gomez's counsel argued for an extension of time so that the expert could generate a report that would be inadmissible under the project influence rule.

After reviewing the record in this case, we find no abuse of discretion in the circuit court's January 9, 2015, ruling prohibiting Gomez's expert appraiser from testifying. The Commission would have been surprised and prejudiced by the expert's testimony in the planned-for February 2015 trial. Additionally, the assertions of Gomez's counsel after the close of discovery suggest that the expert's opinion would have been wholly inadmissible. We therefore affirm the circuit court's ruling striking Gomez's expert.

### D.
### Striking Gomez's "Claims"

The Commission scheduled a deposition of Gomez for the morning of November 18, 2014, and provided proper notice. However, Gomez did not appear for her deposition. Counsel for Gomez appeared and stated he had met with Gomez the day before, and stated that Gomez said she would meet him at his office before traveling to the deposition site. However, counsel said his client had failed to meet him at his office that morning, and said repeated calls to Gomez were unanswered and that he was unable to locate her.

Thereafter, the Commission made a motion for sanctions against Gomez, and asked the circuit court to strike Gomez's "claims." At a December 22, 2014, hearing, the circuit court's entire discussion of the motion is as follows: "I'm going to grant the request to strike the claims[.]" In a January 9, 2015, order, the circuit court likewise

31

summarily granted the motion: "As to the [Commission]'s Motion to Strike Claims . . .

that motion is GRANTED." Gomez now asserts the circuit court's ruling was in error.

In *Cattrell Companies, Inc. v. Carlton, Inc*, we stated that a circuit court

may impose sanctions when a party fails to appear at a scheduled deposition, but only

after making specific findings:

> Before a circuit court may impose the sanction of
> dismissal or default judgment under Rule 37(d) of the West
> Virginia Rules of Civil Procedure for a party's failure to
> attend a deposition, the court must first make a finding that
> the party's failure was due to willfulness or bad faith. Once
> this finding has been made, the circuit court must then weigh
> the following factors to determine if default judgment or
> dismissal is an appropriate sanction: (1) the degree of actual
> prejudice to the other party; (2) the effectiveness of less
> drastic sanctions; and (3) any other factor that is relevant
> under the circumstances presented.[72]

In the instant case, the circuit court made no finding that Gomez's failure to

attend her deposition was willful or in bad faith, as required by *Cattrell Companies*.

Even assuming willfulness or bad faith, the circuit court never weighed the actual

prejudice to the Commission, the effectiveness of less drastic sanctions, or made any

analysis of the parties' situation. On this record, we find the circuit court abused its

discretion by failing to conduct the required analysis under *Cattrell Companies*.

We additionally note that the circuit court's order, as written, is

meaningless. The circuit court agreed to "strike the claims" of Gomez; we are unclear

---

[72] Syllabus Point 6, *Cattrell Companies, Inc. v. Carlton, Inc*., 217 W.Va. 1, 614 S.E.2d 1 (2005).

what the word "claim" means in the context of a condemnation case. A "claim" might

mean Gomez's factual assertions or her defenses to the Commission's evidence. In a

typical civil case, had the circuit court struck Gomez's "pleadings," the meaning would

be clearer: under Rule of Civil Procedure 7(a) [1998], a pleading is either the complaint

or the answer.[73]

We need not discern the meaning of the word "claim." We simply find that

the circuit court erred by failing to make the specific findings required by *Cattrell*

*Companies, Inc. v. Carlton, Inc.*

---

[73] Rule 7(a) actually is more intricate, and defines pleadings thusly:

**Pleadings**. There shall be a complaint and an answer; a reply
to a counterclaim denominated as such; an answer to a cross-
claim, if the answer contains a cross-claim; a third-party
complaint, if a person who was not an original party is
summoned under the provisions of Rule 14; and a third-party
answer, if a third-party complaint is served. No other
pleading shall be allowed, except that the court may order a
reply to an answer or a third-party answer.

In a condemnation proceeding, there is no statutory requirement that an
answer be served and filed to a condemnation petition. *See* W.Va. Code §§ 54-2-2
[1957] and 54-2-3 [1967]. However, Rule 71A expressly provides that eminent domain
proceedings are now governed by the Rules of Civil Procedure. Hence, "to the extent
that the rules now apply to such a proceeding, an answer should be filed under the
requirements of Rule 12(a) and other applicable rules." Franklin D. Cleckley, Robin Jean
Davis, and Louis J. Palmer, *Litigation Handbook on West Virginia Rules of Civil
Procedure*, 1392 (4th ed. 2012).

Rule 71A is an expression of the Court's constitutional authority to regulate
the procedures for litigation in this State. *See* W.Va. Const. Art. VIII, § 3 ("The court
shall have power to promulgate rules for all cases and proceedings, civil and criminal, for
all the courts of the State relating to . . . process, practice and procedure, which shall have
the force and effect of law.").

**E.**
**Judicial Notice of the Value of the Land Taken**
**Based upon the Condemnation Commissioners' Report**

After the circuit court entered orders striking Gomez's "claims," and striking Gomez's only expert on land valuation, the Commission made a motion for the circuit court to take judicial notice of the property's fair market value based upon the condemnation commissioners' report valuing Gomez's share of the Nutter Farm at $33,335. In its summary judgment order, the circuit court granted the motion.

Gomez argues that the circuit court wrongly took judicial notice of the condemnation commissioners' reported value of her land interest. We agree, and reverse the circuit court's ruling.

Under Rule 201 of the Rules of Evidence,[74] "a court is permitted to take judicial notice of adjudicative facts that cannot reasonably be questioned in light of

---

[74] Rule of Evidence 201(a) and (b) [2014] states, in pertinent part:

(a) This rule governs only judicial notice of adjudicative facts.

(b) The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(continued . . .)

34

information provided by a party litigant."[75]  The Commission argues that the parties were permitted to appear before the condemnation commissioners, to present evidence, and to examine and cross-examine witnesses under oath.  The condemnation commissioners' report, it argues, is an adjudicative fact that cannot be disputed because it was the condemnation commissioners' ultimate decision after considering all of the evidence and testimony presented by the parties.

We reject the Commission's argument.  While a condemnation proceeding is governed by the Rules of Civil Procedure[76] and the Rules of Evidence,[77] we must remember that the proceeding exists to fulfill a constitutional mandate: that, when sought by a party, just compensation for land taken for public use "shall be ascertained by an impartial jury of twelve freeholders."[78]  Unless the parties agree otherwise,[79] the statutory eminent domain process created by the Legislature requires the circuit court to appoint

---

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

[75] *Arnold Agency v. W.Va. Lottery Comm'n*, 206 W.Va. 583, 596, 526 S.E.2d 814, 827 (1999).

[76] *See* Rule of Civil Procedure 71A [2001] ("Eminent domain proceedings in the circuit courts are governed by these rules of civil procedure.").

[77] *See* Rule of Evidence 1101(a) [2014] ("[T]hese rules apply to all actions and proceedings in the courts of this state.").

[78] W.Va. Const. Art. III, § 9.

[79] W.Va. Code § 54-2-11a [1963] (allowing parties, by agreement, to waive a report by condemnation commissioners, in which case compensation "shall be ascertained by a jury").

condemnation commissioners who will "ascertain what will be a just compensation"[80] and thereafter file a report with the circuit court.[81] The condemnor may, if it chooses, pay into court the just compensation stated in the report and obtain an order to "enter upon, take and use" the property.[82]

However, any party may object to the condemnation commissioners' report and demand a jury trial. Within 10 days after that report is filed,

> either party may file exceptions thereto, and demand that the question of the compensation, and any damages to be paid, be ascertained by a jury, in which case a jury of twelve freeholders shall be selected and impaneled for the purpose, as juries are selected in civil actions.

Only if no timely objections to the report are filed must the circuit court, in most instances, confirm the report and accept the valuation.[83]

In the instant case, Gomez filed an objection to the condemnation commissioners' report within 10 days. Once that objection was filed, constitutionally and statutorily the parties were entitled to have just compensation (and any other damages) ascertained by a jury of twelve freeholders. It was therefore error for the circuit court to take judicial notice of the property's value in the condemnation commissioners' report.

---

[80] W.Va. Code § 54-2-5.

[81] W.Va. Code § 54-2-9 [1963].

[82] W.Va. Code § 54-2-13 [1981].

[83] W.Va. Code § 54-2-10. *But see* W.Va. Code § 54-2-11 [1923] (allowing report to be set aside if "it be defective or erroneous on its face").

### F.
### Summary Judgment was Wrong

It is a well-established rule that summary judgment is appropriate "only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."[84] The Commission asserted below that Gomez had no evidence to offer as to the valuation of her property, yet simultaneously contradicted that assertion by admitting that Gomez herself could testify to the valuation. The circuit court likewise acknowledged in its summary judgment order that evidence "could have [been] submitted at trial as to the value of the take" through "the testimony of Gomez." Summary judgment was therefore plainly wrong.

Ordinarily, a person who is not qualified as an expert witness may not testify as to the value of property taken by condemnation (or about damages to the residue, if any). However, in a condemnation case, "[o]ur law has long recognized the admissibility of a landowner's opinion concerning the value of his land."[85] The

---

[84] Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

[85] *W.Va. Dep't of Highways v. Sickles*, 161 W.Va. 409, 411, 242 S.E.2d 567, 570 (1978). *See also Western Pocahontas Properties*, 236 W.Va. at 73 n.87, 777 S.E.2d at 642 n.87 (citing cases permitting the owner of property to express an opinion on its value on the assumption that an owner has some knowledge of his property's worth).

In rare cases, an opinion on the value of the property taken can be offered by other lay witnesses with personal knowledge. The weight to be given to the testimony and the credibility of the witness is for the jury. *See*, *e.g.*, Syllabus Point 5, *Guyandotte*

(continued . . .)

"authorization for a landowner to testify is not merely the granting of permission to the litigants to act out" and "testify to grossly inflated values."[86]

Gomez has the right to offer her opinion about the value of her one-third interest in the land before a jury. She may be aware of comparable sales (for example, her brothers' sale of their one-third interests in the subject property to the Northgate developer for $58,333.33 each). Therefore, genuine issues of material fact existed for resolution by the jury concerning the just compensation due to Gomez for her interest in the Nutter Farm. It was error for the circuit court to grant summary judgment to the Commission.

## IV.
## CONCLUSION

---

*Valley Ry. Co. v. Buskirk*, 57 W.Va. 417, 50 S.E. 521 (1905) ("The opinions of persons residing near the property and who have known it for a considerable period of time, though not dealers in real estate nor specially informed as to prices, are admissible evidence on the question of its value."); Syllabus Point 1, *Tennessee Gas Transmission Co. v. Fox*, 134 W.Va. 106, 58 S.E.2d 584 (1950) ("A witness in a proceeding in eminent domain who is acquainted with the land involved, or who has recently visited and examined it and is familiar with the market value of other lands in the same locality, or who owns and has lived upon the land, is sufficiently qualified to give his opinion of its market value. The opinion evidence of a witness so qualified is admissible but its weight and its credibility are questions for the jury."). *But see* Syllabus Point 4, *State Rd. Comm'n v. Darrah*, 151 W.Va. 509, 153 S.E.2d 408 (1967) ("In an eminent domain proceeding, a non-expert witness is not competent to express an opinion concerning the market value of the land taken or the damages to the residue, beyond benefits, unless he has some peculiar qualification or more knowledge in relation to the subject of such opinion than jurors are ordinarily supposed to have.").

[86] *Sickles*, 161 W.Va. at 412, 242 S.E.2d at 570.

After careful consideration, we find no error in the circuit court's first three pretrial rulings: (1) The determination of whether land is being condemned for a public use is plainly a question of law solely for judicial consideration, and the circuit court correctly found the Commission's stated reasons for the taking were a proper public use; (2) any enhancement or depreciation in value caused by the project for which the land was taken must be disregarded in determining the market value of the land; and (3) the circuit court did not abuse its discretion in striking Gomez's expert.

As to the fourth pretrial ruling, we find that the circuit court's striking of Gomez's so-called "claims" as a sanction for her failure to appear at her deposition was error. Fifth, we find that the circuit court erred in taking judicial notice of the condemnation commissioners' report on the value of the land.

Lastly, we find the circuit court erred in granting the Commission's motion for summary judgment. Gomez has a right to testify to the value of her interest in the property on the date of the taking by the Commission. The circuit court's March 12, 2015, order is reversed and the case is remanded for further proceedings.

Affirmed, in part, reversed, in part, and remanded.